THOMAS X. AVANT, RICHARD ANDERSON, CLIFTON BRANDON, JAMES CAGLE, RONALD CRAWFORD, ROBERT CUTLER, GEARY GLASSPIE, ANDREW X. HOLIDAY, JOHN JOHNSON, JR., LEONARD JOHNSON, THOMAS J. KARTNER, CHARLES LEE, KENNETH T. MARKS, DWIGHT MASON, JAMES McKEEVER, GREGORY MELVUS, ELLSWORTH X. SMITH, THOMAS MILTON STEVENS, JR., DONALD D. WASHINGTON, JOHN WILBELY, THOMAS WOOTON, JEROME AUSTELL, ALFRED AUSTELL, JOHN RICHARD MILLER AND ANTHONY M. PUCHALSKI, INMATES OF THE NEW JERSEY STATE PRISON SYSTEM, ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED, AND STEPHEN M. NAGLER, A NEW JERSEY RESIDENT AND A MEMBER OF THE PUBLIC-AT-LARGE, ON BEHALF OF HIMSELF AND ALL THOSE SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS, v. ROBERT L. CLIFFORD, COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF INSTITUTIONS AND AGENCIES AND THE NEW JERSEY DEPARTMENT OF INSTITUTIONS AND AGENCIES, DEFENDANTS-RESPONDENTS.

Argued January 6, 1975—Decided June 23, 1975.

498

502

*Mr. Henry A. Hill, Jr.* and *Mr. Steven H. Gifis* argued the cause for the appellants (*Messrs. Mason, Griffin and Pierson* and *Mr. Steven H. Gifis,* attorneys).

*Mr. Joseph T. Maloney,* Deputy Attorney General, argued the cause for respondents (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

*Mr. Jeffrey A. Mintz,* First Assistant Deputy Public Defender, argued the cause for *amicus curiae* Office of Inmate Advocacy of the Department of the Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate of New Jersey, attorney).

*Mr. Gregory B. Reilly* argued the cause for *amicus curiae* New Jersey Association on Correction (*Mr. Joseph LeVow Steinberg,* attorney).

The opinion of the Court was delivered by

HUGHES, C. J. This case involves a broad challenge, on constitutional and other grounds, of disciplinary procedures in effect in the New Jersey State Prison system.[1] As part

---

[1]That system includes the State Prisons at Trenton, Rahway and Leesburg, within the framework of all the correctional institutions of the State. *N. J. S. A.* 30:1–7.

of its responsibility for the administration of the penal and correctional institutions, the Department of Institutions and Agencies, a principal department in the Executive Branch of the state government, promulgates standards and rules embodying these procedures. The department comprises the Commissioner of the Department of Institutions and Agencies as department head and chief executive officer, the State Board of Institutional Trustees (having some policy, research and recommendatory but no administrative functions) and various divisions, officials and employees provided by law. *N. J. S. A.* 30:1-1 *et seq.* In the statutory scheme, basic administrative jurisdiction and responsibility inhere in the commissioner.[2]

The complaining parties herein (plaintiffs) include a number of past and present State Prison inmates and also Mr. Stephen M. Nagler, a New Jersey resident, purporting to represent the public interest in the issue.[3] The New Jersey Association on Correction[4] has participated as *amicus curiae,* and later the Office of Inmate Advocacy of the newly created Department of the Public Advocate was also welcomed as an

---

[2]The statute provides:

30:1-12. *General Policy; rules and regulations*

The commissioner shall have power to determine all matters relating to the unified and continuous development of the institutions * * * within his jurisdiction. He shall determine all matters of policy and shall have power to regulate the administration of the institutions * * * within his jurisdiction, correct and adjust the same so that each shall function as an integral part of a general system. The rules, regulations, orders and directions issued by the commissioner pursuant thereto, for this purpose shall be accepted and enforced by the executive having charge of any institution or group of institutions * * * or any phase of the work within the jurisdiction of the department.

[3]Mr. Nagler is Executive Director of the American Civil Liberties Union of New Jersey.

[4]A private citizen group, long interested in correctional reform, previously known as the Morrow Association on Correction.

*amicus* participant.[5] The defendants-respondents are the Commissioner of the Department of Institutions and Agencies,[6] and the Department itself as responsible for the challenged standards and rules. No question is raised as to the standing and interest of parties or *amici*.

The rather complicated factual and procedural history of the cause may be considered to have commenced on November 25, 1971, when a riot broke out in the New Jersey State Prison at Rahway, entailing violence including the holding of hostages, the infliction of personal injuries and extensive destruction of property. Fortunately, no deaths occurred, although such had been the case in other rebellions in prisons across the nation.[7] Upon the restoration of order at Rahway, a number of prisoners, including plaintiffs, suspected of active participation in the riot were temporarily removed from Rahway and transferred to the Youth Correction Center at Yardville, a minimum security facility, under the authority of *N. J. S. A.* 30:4–85.[8]

---

[5] The Office of Inmate Advocacy was created by the Department of the Public Advocate Act of 1974, *L.* 1974, *c.* 27, §§ 11–13 (May 13, 1974). Its duties are defined by statute as follows:

The Office of Inmate Advocacy may represent the interests of inmates in such disputes and litigation, as will, in the discretion of the Public Defender, best advance the interests of inmates as a class on an issue of general application to them, and may act as representative of inmates with any principal department or other instrumentality of State, county or local government. *Id.*, § 13.

[6] The present Commissioner of the Department of Institutions and Agencies is Ann Klein.

[7] South Carolina Dep't of Corrections, Collective Violence Research Project, *Collective Violence in Correctional Institutions: A Search for Causes*, Appendix b (1973); Garson, "Force versus Restraint in Prison Riots," 18 *Crime and Delinquency* 411 (1972); New York State Special Comm'n on Attica, *Attica, The Official Report*, Appendices C, E (1972).

[8] *N. J. S. A.* 30:4–85 provides:

Any inmate of any correctional institution as classified in section 30:1–7 of this Title may be transferred to any other such correctional institution by order of the commissioner * * *.

Plaintiffs thereafter instituted in the United States District Court for the District of New Jersey an action under the Civil Rights Act, 28 *U. S. C.* § 1343 and 42 *U. S. C.* §§ 1983, 1985 and 1988, and the Declaratory Judgments Act, 28 *U. S. C.* §§ 2201 and 2202. Their complaint in that civil action, *Avant v. Cahill,* Docket No. 1883–71 (D.N.J. Nov. 3, 1972) alleged, in part, that their transfer from Rahway to Yardville was punitive in nature, and that their summary transfer and assignment to administrative segregation, without a hearing, offended their constitutional rights to due process. Shortly after their arrival at Yardville, plaintiffs were advised that as a result of their involvement in the riot at Rahway, disciplinary charges had been initiated against them, but the State voluntarily deferred holding administrative disciplinary hearings during the pendency of the Federal action. Evidentiary hearings in *Avant v. Cahill* were commenced by a District Court Judge with respect to the transfer and to the conditions under which plaintiffs were detained at Yardville. During the course of such hearings the Middlesex County Grand Jury indicted plaintiffs and others for various criminal offenses alleged to have occurred during the course of the Rahway riot.

Also during this period it was noted that the State of New Jersey (the department) had promulgated new rules with respect to prison disciplinary procedures effective January 24, 1972, and that such rules were purportedly adopted pursuant to statutory authority and were to be of statewide application. Inasmuch as plaintiffs' seeking of injunctive relief implicated the validity of such rules, this latter development withdrew from the single District Court Judge jurisdiction which could then be exercised federally only by a District Court of three judges, 28 *U. S. C.* § 2281, and that court was ultimately organized after the hearings were suspended by consent.

As recounted in the unpublished opinion of Judge Barlow for that three judge court (filed November 3, 1972),

subsequent developments were such as to alter this posture of the case:

During the time that the proceedings were thus suspended, five of the Rahway transferees — two of them plaintiffs in this matter — escaped from Yardville. The State of New Jersey, understandably concerned with the possibility of further escapes, immediately withdrew its voluntary deferment of the disciplinary proceedings. Proceedings were promptly held. As a result of the hearings, all or most of the plaintiffs here were found guilty of disciplinary infractions, were removed from Yardville to maximum security prisons in the state, and placed in administrative segregation at such institutions. [footnote omitted]

Another case in the Federal Court, *Austell v. Yeager*, Civil Action No. 44–72, had been consolidated with *Avant v. Cahill*, the facts in the *Austell* case described by Judge Barlow as being much simpler. Four plaintiffs, inmates of the New Jersey State Prison, were accused of instigating a work-stoppage; as a result they were placed in administrative segregation, without a hearing. Those plaintiffs alleged unconstitutional imposition upon them of punitive discipline. Their case being consolidated with *Avant v. Cahill*, the State voluntarily returned them to the general prison population pending determination of the Federal litigation.

Noting that plaintiffs challenged the State regulations on the basis of New Jersey law, including the alleged absence of sufficient statutory standards for delegation of authority to the Commissioner and other defects suggested therein, the Federal Court abstained until such matters could be passed upon by the New Jersey courts. It referred to the language of the United States Supreme Court in *Reetz v. Bozanich*, 397 *U. S.* 82, 90 *S. Ct.* 788, 25 *L. Ed.* 2d 68 (1970), restating that Court's holding in *City of Meridian v. Southern Bell Tel. & Tel. Co.*, 358 *U. S.* 639, 79 *S. Ct.* 455, 3 *L. Ed.* 2d 562 (1959) as follows:

"Proper exercise of federal jurisdiction requires that controversies involving unsettled questions of state law be decided in the state tribunals preliminary to a federal court's consideration of the under-

lying federal constitutional questions. * * * That is especially desirable where the questions of state law are enmeshed with federal questions. * * * Here, the state law problems are delicate ones, the resolution of which is not without substantial difficulty — certainly for a federal court. * * * In such a case, when the state court's interpretation of the statute or evaluation of its validity under the state constitution may obviate any need to consider its validity under the Federal Constitution, the federal court should hold its hand, lest it render a constitutional decision unnecessarily." [397 *U. S.* at 85, 90 *S. Ct.* at 789–90, 25 *L. Ed.* 2d at 71]

Relief in the federal courts thus being withheld, the plaintiffs next brought an action by way of an appeal to our Appellate Division pursuant to *R.* 2:2–3(a)(2).[9] On February 27, 1973, defendants-respondents filed a "Statement of Items Comprising the Record on Appeal" which included, *inter alia,* a copy of the Standards of the Division of Correction and Parole of the New Jersey Department of Institutions and Agencies (then extant, being effective January 24, 1972) governing the Discipline Program area, the New Jersey State Prison Inmate Rule Book as revised in May, 1972, and a list of penalties which might be imposed by the institutional disciplinary committee.

On June 5, 1973, this Court ordered that this appeal be certified directly to it. *R.* 2:12–1. The case was first argued before this Court on September 25, 1973. There were changes in the membership of the Court in that year, and the case came on for reargument on November 21, 1973. In the course of that argument the Court requested counsel to provide it with information as to procedures in other state and federal prison systems, specifically as to whether confrontation and cross-examination of witnesses to a disciplinary infraction were permitted and their impact upon the operation of such systems. The result of such inquiry was embodied in a

---

[9] *R.* 2:2–3(a)(2) provides, *inter alia,* that "* * * appeals may be taken to the Appellate Division as of right * * * to review the validity of any rule promulgated by * * * [any state administrative] agency or officer; * * *."

report in a supplemental brief and appendix circulated to counsel and filed with the Court.

On June 26, 1974, the United States Supreme Court issued its significant opinion in *Wolff v. McDonnell*, 418 *U. S.* 539, 94 *S. Ct.* 2963, 41 *L. Ed.* 2d 935 (1974), enumerating the procedural due process rights of state prison inmates in prison disciplinary proceedings. Consequently on July 3, 1974, plaintiffs sought reargument, and the Court scheduled such argument for its Fall session.[10] Meanwhile, on July 16, 1974, the Attorney General, on behalf of defendants-respondents, advised the Clerk of the Court of relevant changes which had been made in the standards and rules during the pendency of the action, including publication in 6 *N. J. Register* 15 of some 185 pages of standards and rules, relating to inmates' rights and duties in state correctional institutions, for inclusion in the New Jersey Administrative Code at *N. J. A. C.* 10:35–1.1, *et seq.* The Department also issued its "Guidelines Regarding Application of Disciplinary Procedures as Required in *Wolff v. McDonnell.*"[11] On September

---

[10]Previous cases in other courts were also being reconsidered in light of *Wolff*. *E. g.*, *Palmigiano v. Baxter*, 487 *F.* 2d 1280 (1st Cir. 1973), *vacated and remanded*, 418 *U. S.* 908, 94 *S. Ct.* 3200, 41 *L. Ed.* 2d 1155 (1974), 510 *F.* 2d 534 (1st Cir. 1974) ; *Gomes v. Travisono*, 490 *F.* 2d 1209 (1st Cir. 1973), *vacated and remanded*, 418 *U. S.* 909, 94 *S. Ct.* 3200, 41 *L. Ed.* 2d 1155 (1974), 510 *F.* 2d 537 (1st Cir. 1974) ; *Clutchette v. Procunier*, 497 *F.* 2d 809 (9th Cir. 1974), *modified*, 510 *F.* 2d 613 (9th Cir. 1974) ; *Walker v. Hughes*, 386 *F. Supp.* 32 (E. D. Mich. 1974).

[11]Those responsible for prison administration in other jurisdictions were also responding to *Wolff*. For example, the Federal Bureau of Prisons, updating its rules, expressed its "purpose" as follows:

This statement of policy is to assure that inmate discipline and control are fully consonant with the correctional objectives of the institution, the focus being on (a) individual inmate adjustment to the programs, behavior standards, and limitations necessarily imposed by the administration; (b) the general welfare and safety of the institutional community; and, (c) the incorporation of due process standards for inmate disciplinary hearings as prescribed by the Supreme Court in *Wolff v. McDonnell* [citation omitted].

16, 1974, the Court granted the motion of the Office of Inmate Advocacy to appear as *amicus curiae.* On October 3, 1974, the Department issued an Administrative Memorandum dealing, *inter alia,* with (a) an inmate's right to counsel-substitute and (b) the adjustment committee's discretion regarding the collection and presentation of evidence. The Inmate Advocate's Office of the Department of the Public Advocate filed its brief on October 29, 1974.

The case was argued for a third time on January 6, 1975, the Court urging the parties, as it had done before, to cooperate in any appropriate manner for the improvement of the institutional rules and standards, particularly since during the pendency of the federal and state court litigation it had come to appear, as pointed out in the brief of plaintiffs, that "the focus of both the *Avant* and *Austell* cases shifted to an attack upon the new procedures * * *."

The plaintiffs as well as the *amici* continue, of course, to urge that the delegation of authority to the Commissioner is defective insofar as it is not accompanied by sufficient legislative standards; that the promulgation of those rules failed to comply with the requirements of the New Jersey Administrative Procedure Act, *N. J. S. A.* 52:14B-1 *et seq.;* that plaintiffs' rights under the First and Fourteenth Amendments are offended because the promulgation of such rules and regulations is accomplished without notice to the public, and that such substantive rules and regulations are unconstitutionally vague and deficient.

---

[Federal Bureau of Prisons, Policy Statements, "Inmate Discipline," ¶ 1, 7400.5C, 10–4–74]

*Wolff* has prompted revisions in state regulations as well. *E. g.,* Nebraska Dep't of Corrections, Memorandum 804.001, "Inmate Discipline" (November 21, 1974); Illinois Dep't of Corrections, Adult Division, A. R. 804, "Administration of Discipline" (November 15, 1974). See also, American Bar Association Commission on Correctional Facilities and Services, *Survey of Prison Disciplinary Practices and Procedures,* Appendix D, "Analysis of the Effects of *Wolff v. McDonnell* on Prison Disciplinary Practices and Procedures" (December 1974).

For the completion of the record it should be recalled that at the oral argument of January 6, 1975, the Office of the Attorney General, on behalf of the Department, had assured the Court that it was continuing its efforts to refine and improve its standards governing the inmate discipline programs and procedures. On March 20, 1975, it filed with the Court on appropriate notice to all parties, newly revised Standards effective March 24, 1975. These new standards elicited a mixed reception from the parties. Counsel for plaintiffs, though reserving all other points of argument, commended the improved procedures.[12] On the other hand the New Jersey Association on Correction was "distressed and dismayed" by this new development.[13]

For the sake of finality and scope of decision, we shall attempt to weigh the current standards and rules against our concept of fairness, due process and constitutional right

---

[12]"Having objected to the manner of the rules promulgation, we must in candor and in fairness to our clients and to the inmate population commend the Department on an excellent job of balancing the competing interests to arrive at what is, in our view, the fairest and most liberal approach to inmate discipline yet developed. The optional authorization of independent hearing officers, the upgrading of the adjustment committee personnel, the requirement of listed offense more clearly defined and limited with required sanction ranges, the encouragement of informal sanctions, the invention of a middle-level adjustment approach, and the granting of inmate counsel-substitutes and discretionary confrontation are all important advances that respond to particular objections raised by the plaintiffs. While some may doubt the capacity of the prison to administer fairly such discretionary standards as witnesses, confrontation, and up and down-grading of disciplinary levels, we are prepared to wait for concrete abuses, should they develop, rather than to condemn a comprehensive and well thought out attempt to rationalize and liberalize prison discipline." [Plaintiffs' April 8, 1975, filing with Court]

[13]"We are distressed and dismayed that the Department of Institutions and Agencies would undertake development of such a comprehensive set of rules governing institutional behavior and discipline, much less adopt and implement them, while the nature and method of promulgation of such rules are the subject of litigation before the Court." [New Jersey Association on Correction filing with Court of April 1, 1975]

with sufficient certainty to allay the fears expressed that the Department might one day (perhaps under different administration) discard the new reforms and resume older and allegedly improper procedures. In addition to what other courts have ruled and what we shall say here, there are other substantial assurances of the permanency of reform.

The National Advisory Commission on Criminal Justice Standards and Goals (Peterson Commission) in 1973 adjured the states and their correctional agencies to energize rules reflecting due process requirements with respect to discipline (with which those most recently adopted in New Jersey are generally compatible). National Advisory Commission on Criminal Justice Standards and Goals, *Report on Corrections,* Standard 2.12 at 51–52. See also, National Council on Crime and Delinquency, "A Model Act for the Protection of Rights of Prisoners," 18 *Crime and Delinquency* 1 (1972).

The United Nations Standard Minimum Rules for the Treatment of Prisoners (1974) suggests in Rule 35 that:

(1) Every prisoner on admission shall be provided with written information about the regulations governing the treatment of prisoners of his category, the disciplinary requirements of the institution, the authorized methods of seeking information and making complaints, and all such other matters as are necessary to enable him to understand both his rights and his obligations and to adapt himself to the life of the institution.

(2) If a prisoner is illiterate, the aforesaid information shall be conveyed to him orally.

As well, the New Jersey Legislature has recently expressed its insistence on fairness in the disciplinary process. On April 21, 1975, it adopted Senate Bill 762 (signed by the Governor on May 15, 1975 and now *L.* 1975, *c.* 95) to provide that:

1. Subject to guidelines set down by the Director of the Division of Correction and Parole, every State penal and correctional institution shall formally promulgate and publish rules and regulations

governing the rights, privileges, duties and obligations of the inmate population confined therein. Among other things, such publications shall set forth the authorized sanctions for various classes of violations of the aforesaid rules and regulations, and detail the procedures for imposing summary and administrative punishment as well as for appealing therefrom. No punishment may be meted out other than of the type and in the manner prescribed by such rules and regulations.

2. Upon the arrival of a prisoner in any correctional institution in the State, he shall be furnished with a copy of the institution's rules and regulations and shall have the meaning of the same explained to him. Spanish language copies of the institutional rules and regulations shall be provided to Spanish-speaking prisoners not conversant with the English language To the extent possible, foreign language speaking prisoners not sufficiently conversant with the English language shall also be provided with verbal explanations in their language of greatest facility of all institutional rules and regulations.

Portions of this legislation are duplicative of existing sections of the Standards recently adopted by the New Jersey Department which require that within two days of admission each inmate shall be given a copy of an inmate handbook (591.213) containing information relating to rights and privileges of offenders including the right to constitutional due process (591.273) and dealing with the disciplinary process in general (591.277), as well as other notice material. The sections of the Standards on the Inmate Discipline Program (250 *et seq.*) require that each inmate on arrival be advised in writing of the acts prohibited and types of disciplinary action which may be taken and other information concerning the disciplinary system (251.261). Inmates unable to read, write, speak or understand English have additional rights of communication with administrative personnel in their own language. The written information tendered to inmates lists prohibited acts (251.263), and specifies the range of sanctions for violations (251.264). Despite such redundancy, the adoption of the statute evinces a legislative intent auguring well for the permanency of reform.

Thus, though we mold the record to deal with the present standards of procedure, we have no doubt of the propriety

and permanent effect of the decisional reach of the opinions we here express,[14] as to deal satisfactorily by way of legal measurement with those standards previously in effect.

At the end of its long journey, then, the case has now been ably briefed and fully argued and is therefore ripe for decision.

We consider here issues involving not only the constitutional and other rights of prisoners but the preservation of societal order through enforcement of the law, including as integral to the latter the maintenance of security of the penal and correctional institutions of the state. We thus deal with imperatives concerned not only with individual right but with the peace and protection of the people, — and so must view as relevant to each other concepts associated with the establishment of justice and the insuring of domestic tranquility, as did our forefathers in the Preamble to the Constitution itself.

These issues have not lacked importance since Americans chose long ago to be governed under constitution rather than other forms. But now, under the urgency and pressures of the times, they have reached a stage so crucial as to demand priority of attention from every branch of government. Horrendous conditions frequently incident to imprisonment, and abuses not only of constitutional right but basic elements of decency in the disciplinary process, have been increasingly directed to public attention. It has been said that, "[l]ife in present day American prisons is generally barren and futile, and at worst brutal and degrading." Gifis, "Decisionmaking in a Prison Community," 1974 *Wis. L. Rev.* 349, 350, n. 6. See Menninger, *The Crime of Punishment*

---

14"* * * [T]here is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public." [*Busik v. Levine*, 63 *N. J.* 351, 363 (1973)]

(1968); Hirschkop and Millemann, "The Unconstitutionality of Prison Life," 55 *Va. L. Rev.* 795 (1969). The blunting of societal conscience leads inevitably to eventual societal danger (*Attica, The Official Report, supra*) and appeals to that conscience have long been made.[15] This dichotomy, of the voice of conscience and the good sense of societal protection, no doubt accounts for the tendency of the law to progress in recent years from the judicial reticence expressed in *McCloskey v. Maryland*[16] to the explication of the reasons for caution in intervention of *Procunier v. Martinez*[17] to, finally, the confrontation by the Su-

---

[15]Sir Winston Churchill, as Home Secretary in 1910, made a speech to the House of Commons which has often been quoted:

The mood and temper of the public in regard to the treatment of crime and criminals is one of the unfailing tests of any country. A calm, dispassionate recognition of the rights of the accused, and even of the convicted criminal, against the State — a constant heart-searching by all charged with the duty of punishment — a desire and eagerness to rehabilitate in the world of industry those who have paid their due in the hard coinage of punishment * * *. These are the symbols, which, in the treatment of crime and criminal, mark and measure the stored up strength of a nation, and are sign and proof of the living virtue within it. [*Parlimentary Debates*, House of Commons, 1910, xix, col 1354]

As Chief Justice Burger has said:

* * * [W]hen a sheriff or a marshal takes a man from a courthouse in a prison van and transports him to confinement for two or three or ten years, this is our act. We have tolled the bell for him. And whether we like it or not, we have made him our collective responsibility. We are free to do something about him; he is not. [Burger, "No Man is an Island," 56 *A. B. A. J.* 325, 326 (1970)]

*See also Trop v. Dulles*, which held:

The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. [356 *U. S.* 86, 101, 78 *S. Ct.* 590, 598, 2 *L. Ed.* 2d 630, 642 (1958)]

[16]"In the great mass of instances, however, the necessity for effective disciplinary controls is so impelling that judicial review of them is highly impractical and wholly unwarranted." [*McCloskey v. Maryland*, 337 *F.* 2d 72, 74 (4th Cir. 1964) (footnote omitted)]

[17]"Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal

preme Court in *Wolff, supra,* with "important questions concerning the administration of a state prison" in respect of disciplinary procedures.

The issues in the present case come to us, under our constitutional system, in our role as final arbiter of the validity of state action, federal courts having abstained, as stated, pending the finality and scope of decision in the state courts, that being thought to have the potential of making unnecessary further consideration in the federal forum of federal constitutional issues involved. *Reetz v. Bozanich, supra; see, Procunier v. Martinez, supra; Baggett v. Bullitt,* 377 *U. S.* 360, 84 *S. Ct.* 1316, 12 *L. Ed.* 2d 377 (1964).

Considering first the substantive validity of the rules themselves (apart and aside from the challenged manner of their promulgation) the Court must be conscious of that "healthy sense of realism" mentioned by Mr. Justice Powell in *Procunier v. Martinez, supra.*

---

review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. * * *

"But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims * * *." [*Procunier v. Martinez,* 416 *U. S.* 396, 404, 94 *S. Ct.* 1800, 1807, 40 *L. Ed.* 2d 224, 235–236 (1974) (footnotes omitted)]

 Turning away from any illusion that a court by judicial fiat can enforce the idealism of poets,[18] as resolutely we must remind ourselves of another important judicial constraint, against questioning the wisdom (as distinguished from measuring the constitutional validity) of the legislative decision to confer upon the Commissioner and Department the wide charter of management and control of the institutions embodied in *N. J. S. A.* 30:1-1 *et seq., supra.* The Court has frequently recognized this limitation. In *Grand Union Co. v. Sills,* 43 *N. J.* 390, 403 (1964), Justice Jacobs said:

* * * [W]e do not sit here as a superlegislature nor do we concern ourselves with the wisdom of *Chapter* 152. Our function is to determine whether the Legislature has gone beyond the outer limits of its constitutional power.

As explicitly, the Court said in *Thomas v. Kingsley,* 43 *N. J.* 524 (1965) that:

We pause to state the scope of our role. We may not question the wisdom of this statute. The policy decision is the exclusive responsibility of the other branches of government. Our narrow authority is to determine whether the statute so plainly exceeds the constitutional power of the Legislature that we must adjudge it invalid. [at 530]

We repeat that whether *Chapter* 141 is otherwise equitable or inequitable, prudent or imprudent, is a matter to be decided exclusively by the legislative and executive branches. [at 534]

And similar expressions, ofttimes on the most controversial issues, leave no room for doubt upon the doctrine, respecting as it so clearly does the appropriate boundaries of action of separate branches of government.[19]

---

[18]"Ah! when shall all men's good
Be each man's rule, and universal Peace
Lie like a shaft of light across the land * * *."
[Alfred, Lord Tennyson, *The Golden Year*]

[19]"It is worth repeating that the Judiciary is not concerned with the good sense of a statute. Policy matters are exclusive responsibility

The United States Supreme Court exercises similar restraint, asserting that it does not

sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs or social conditions. [*Griswold v. Connecticut*, 381 *U. S.* 479, 482, 85 *S. Ct.* 1678, 1680, 14 *L. Ed.* 2d 510, 513 (1964)]

■ In further refinement of the issues, we are not concerned here (nor are the appellants, as emphasized in their brief) with disciplinary response to minor infractions, sometimes called "On-the-Spot-Correction" involving slight punishment such as verbal reprimand, temporary withdrawal of privileges or brief confinement to tier (Standards, 253.271),

of the legislative branch of government. * * * [T]he issue now before us is wholly one of the power of the Legislature to act, and upon that inquiry a judge would usurp authority if his personal view of policy intruded upon his deliberations." [*Two Guys from Harrison, Inc. v. Furman*, 32 *N. J.* 199, 229 (1960) (Weintraub, C. J.) (Sunday Closing Law)]

"The wisdom or unwisdom of that decision is not for us. We do not sit as a superlegislature to decide whether the classification is 'unwise, improvident, or out of harmony with a particular school of thought.' " [*N. J. Chapt., Am. I. P. v. N. J. State Bd. of Prof. Planners*, 48 *N. J.* 581, 609 (1967) (Francis, J.) (Professional Planners Licensing Act)]

"* * * [C]ourts cannot be concerned with the wisdom or policy underlying a statute; that is almost invariably solely within the legislative domain and responsibility." [*Ind. Elec. Assoc. of N. J. v. N. J. Bd. of Exam.*, 54 *N. J.* 466, 473 (1969) (Hall, J.) (Electrical Contractors Licensing Act)]

"It is not for the judiciary to override legislative decisions because their policy may be unappealing. The only question for us is whether the statute is so devoid of arguable merit as to exceed the constitutional restraints upon the Legislature." [*A. & B. Auto Stores of Jones St., Inc. v. Newark*, 59 *N. J.* 5, 19 (1971) (Weintraub, C. J.) (Statute making city responsible for property damage in riot)]

"The arguments bear on the wisdom of the legislation rather than on its validity. Presumably they were all weighed by the Legislature when it concluded that the law would further the public interest and should be adopted. We do not sit here as a superlegislature and we accept the legislative judgment as to the wisdom of the statute." [*Burton v. Sills*, 53 *N. J.* 86, 95 (1968) (Jacobs, J.) (Gun Control Law)]

but even in such case the new standards are protective.[20] We deal rather with disciplinary matters which may subject an individual to "grievous loss" by way of punishment for serious misconduct. It is the prospect of such "grievous loss" which quickens the right to constitutional due process by way of procedural protections. *Morrissey v. Brewer,* 408 *U. S.* 471, 92 *S. Ct.* 2593, 33 *L. Ed.* 2d 484 (1972) ; *Goldberg v. Kelly,* 397 *U. S.* 254, 263, 90 *S. Ct.* 1011, 1018, 25 *L. Ed.* 2d 287, 296 (1970) ; *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 *U. S.* 123, 168, 71 *S. Ct.* 624, 647, 95 *L. Ed.* 817, 852 (1951) (Frankfurter, J. *concurring*). The elements of such "grievous loss" are broadly conceded in the Standards under review, responsive to *Wolff, supra.*[21]

Thus we need not pause here (in view of the Department's acknowledgment of its procedural due process obligations applicable to sanctions entailing "grievous loss") to reexamine older distinctions between "rights" and "privileges." *Goldberg v. Kelly, supra; Shapiro v. Thompson,* 394 *U. S.* 618, 627, n. 6, 89 *S. Ct.* 1322, 1327, 22 *L. Ed.* 2d 600, 611

---

[20]253.271, Program Procedures, states:

Each inmate is informed by the staff member of the minor infraction, disciplinary action and report to be written. The inmate is given a satisfactory opportunity to establish that he is not deserving of such disciplinary action.

The inmate is notified and a written report is submitted no later than the close of the tour of duty during which the minor infraction was committed. The report indicates the infraction, sanction and the date(s) the corrective measures are to be carried out. It is reviewed by the supervisor during whose shift the infraction and sanctioning took place. A written record is made part of the inmate's case folder at the discretion of the supervisor.

[21]"The U. S. Supreme Court opinion in *Wolff v. McDonnell* on June 26, 1974, indicated that inmates charged with serious misconduct required certain due process protections whenever penalties could be imposed resulting in forfeiture or withholding of good time credits; confinement in a disciplinary cell; administrative segregation; transfer to another institution or to a higher security status for disciplinary reasons; or any other action which would tend to affect the inmate's release or parole date or have a major change in the condition of confinement." [Standards, 254.210]

(1969); *Graham v. Richardson*, 403 *U. S.* 365, 374, 91 *S. Ct.* 1848, 1853, 29 *L. Ed.* 2d 534, 543 (1971); Van Alstyne, "The Demise of the Right-Privilege Distinction in Constitutional Law," 81 *Harv. L. Rev.* 1439 (1968). Compare *Carothers v. Follette*, 314 *F. Supp.* 1014, 1026-27 (S. D. N. Y. 1970) with *Hanvey v. Pinto*, 441 *F.* 2d 1154 (3rd Cir. 1971).

 While we consider here procedural due process in its constitutional sense,[22] it should also be remembered that in the exercise by New Jersey courts of their function of review (as here) of the action of administrative agencies (such as the Department of Institutions and Agencies), we have not been satisfied with enforcement of naked constitutional right, but have gone further to strike down arbitrary action and administrative abuse and to insure procedural fairness in the administrative process. For instance, in requiring (on the latter extra-constitutional ground) that a parole board divulge its reasons for denial of parole, Justice Jacobs traced in *Monks v. N. J. State Parole Board*, 58 *N. J.* 238 (1971), the history and rationale of the exercise of this jurisdiction:

Our judicial system has historically been vested with the comprehensive prerogative writ jurisdiction which it inherited from the King's Bench; that jurisdiction has been frequently exercised in the supervision of inferior governmental tribunals including administrative agencies. See the very early cases of *State v. Justices, &c., of Middlesex*, 1 *N. J. L.* *244 (*Sup. Ct.* 1794), where Chief Justice Kinsey described the jurisdiction "as unlimited and universal as injustice and wrong can be" (at *248), and *Ludlow v. Executors of Ludlow*, 4 *N. J. L.* *387 (*Sup. Ct.* 1817), where Chief Justice Kirkpatrick described it as "very high and transcendent" (at *389); and also the more recent cases of *Fischer v. Twp. of Bedminster*, 5 *N. J.* 534 (1950), where Justice Heher noted that the "inherent power of

---

[22]"For more than a century the central meaning of procedural due process has been clear: 'parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" [*Fuentes v. Shevin*, 407 *U. S.* 67, 80, 92 *S. Ct.* 1983, 1994, 32 *L. Ed.* 2d 556, 569 (1972); quoting from *Baldwin v. Hale*, 1 Wall. 223, 233, 68 *U. S.* 223, 233, 17 L. Ed. 531, 534 (1864)]

superintendence of inferior tribunals" (at 560) was secured by the 1844 Constitution and could not be impaired by the Legislature, and *McKenna v. N. J. Highway Authority, supra*, 19 *N. J.* 270, where Justice Burling noted that the prerogative writ jurisdiction included not only the review of "judicial actions" but also the superintendence of civil corporations, magistrates and "other public officers." (at 274). When our 1947 Constitution was prepared, pains were taken to insure not only that the court's prerogative writ jurisdiction would remain intact, but also that the manner of its exercise would be greatly simplified (art. VI, sec. 5, para. 4). See *Ward v. Keenan*, 3 *N. J.* 298, 303–308 (1949). The implementing court rules now provide an easy mode of review designed to insure procedural fairness in the administrative process and to curb administrative abuses. See *In re Masiello*, 25 *N. J.* 590, 603 (1958); *Elizabeth Federal S. & L. Assn. v. Howell*, 24 *N. J.* 488, 499 (1957).

In *White v. Parole Board of State of N. J.*, 17 *N. J. Super.* 580 (App. Div. 1952), a modern counterpart of the ancient writ proceeding, the prisoner's attack on his parole board classification was rejected, but in his opinion for the Appellate Division Justice Brennan suggested that, constitutional compulsions aside, proper procedural safeguards on vital classification issues are called for by "considerations of simple fairness." 17 *N. J. Super.* at 586. So here, fairness and rightness clearly dictate the granting of the prisoner's request for a statement of reasons. That course as a general matter would serve the acknowledged interests of procedural fairness and would also serve as a suitable and significant discipline on the Board's exercise of its wide powers. It would in nowise curb the Board's discretion on the grant or denial of parole nor would it impair the scope and effect of its expertise. It is evident to us that such incidental administrative burdens as result would not be undue; * * *. [58 *N. J.* at 248–49]

Thus, in applying the requirements of procedural "due process" to our scrutiny of the standards under review, we use the term in that broader aspect, not confined entirely to constitutional right as such but going beyond. *See,* Note, "Decency and Fairness: An Emerging Judicial Role in Prison Reform," 57 *Va. L. Rev.* 841 (1971).

We turn to the elements of "due process" (in the broad sense we have described) as invoked in the case of "grievous loss" faced by those charged with serious prison violations, to determine whether such requirements are met in the departmental standards for dealing with disciplinary infractions. This suggests a basic inquiry (by way of analogy) as

it did in the case of parole revocation dealt with by the Supreme Court in *Morrissey v. Brewer, supra,* where it said:

Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 *U. S.* 886, 895, 81 *S. Ct.* 1743, 1748, 6 *L. Ed.* 2d 1230, 1236 (1961). * * * Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure. [408 *U. S.* at 481, 92 *S. Ct.* at 2600, 33 *L. Ed.* 2d at 494]

■■ We have no hesitancy in equating our problem here to the beginning proposition of *Morrissey, supra,* that "revocation of parole" (like prison discipline) "is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply." 408 *U. S.* at 480, 92 *S. Ct.* at 2600, 33 *L. Ed.* 2d at 494. Nor is the governmental stake in the revocation of parole (described in *Morrissey* as an "overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial * * *" 408 *U. S.* at 483, 92 *S. Ct.* at 2601, 33 *L. Ed.* 2d at 495) much unlike the governmental imperative for the maintenance of institutional security and the punishment of disciplinary violations to that end. And just as in *Morrissey* it was thought that "* * * the State has no interest in revoking parole without some informal procedural guarantees," 408 *U. S.* at 483, 92 *S. Ct.* at 2601, 33 *L. Ed.* 2d at 495, we can conceive of no state interest in the imposition of prison discipline absent procedural fairness, however informal, in the accomplishment thereof.

*Morrissey* did not ignore, nor do we, the therapeutic effect of fair procedural justice, recognizable as such by the prison

offender as well as the accused parole violator. *Morrissey* asserted that:

The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked [prison punishment imposed] because of erroneous information or because of an erroneous evaluation of the need * * *. And society has a further interest in treating the parolee [prison offender] with basic fairness: fair treatment * * * will enhance the chance of rehabilitation by avoiding reactions to arbitrariness.

Given these factors, most States have recognized that there is no interest on the part of the State in revoking parole [imposing prison punishment] without any procedural guarantees at all. What is needed is an informal hearing structured to assure that the finding * * * will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the * * * behavior.

We now turn to the nature of the process that is due, bearing in mind that the interest of both State and parolee [prison offender] will be furthered by an effective but informal hearing. [408 *U. S.* at 484, 485, 92 *S. Ct.* at 2601–02, 33 *L. Ed.* 2d at 496; bracketed words added for comparison purposes; footnotes omitted]

█ The *Morrissey* court foreswore, as do we, the obligation to write a code of procedure, that being the obligation of the state (here, the administrative agency). It said:

Our task is limited to deciding the minimum requirements of due process. They include (a) written notice of the claimed violations * * *; (b) disclosure * * * of evidence * * *; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body * * * members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons [for acting]. [408 *U. S.* at 488–89, 92 *S. Ct.* at 2604, 33 *L. Ed.* 2d at 498–99]

The *Morrissey* court emphasized that there was "no thought to equate this [procedural pattern] to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters,

affidavits, and other material that would not be admissible in an adversary criminal trial." 408 *U. S.* at 489, 92 *S. Ct.* at 2604, 33 *L. Ed.* 2d at 499. Yet fair precision, in the statement of judgment and the reasons therefor, was called for by *Morrissey*:

> The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing * * * and the substance of the documents or evidence given * * *. * * * As in *Goldberg* [*Goldberg v. Kelly, supra*], "the decision maker should state the reasons for his determination and indicate the evidence he relied on * * *" [408 *U. S.* at 487, 92 *S. Ct.* at 2603, 33 *L. Ed.* 2d at 498][23]

And in *Morrissey*, the excusal of confrontation and cross examination (later confirmed in *Wolff, supra*) was projected as due to special circumstances such as the safety of informants. Following its decision in *Morrissey*, the United States Supreme Court extended those due process requirements to probation as well as parole revocation in *Gagnon v. Scarpelli*, 411 *U. S.* 778, 93 *S. Ct.* 1756, 36 *L. Ed.* 2d 656 (1973). But the Court in *Wolff v. McDonnell, supra*, withdrew to some extent from the "full range of procedures suggested by *Morrissey*" because of the "very different stake the State has in the structure and content of the prison disciplinary hearing" and went on to say,

> Our conclusion that some but not all of the procedures specified in *Morrissey* and *Scarpelli* must accompany the deprivation of good-time by state prison authorities is not graven in stone. As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings

---

[23]"The requirement of a written decision made on the basis of evidence presented at a hearing protects two major interests. It enables courts to determine, first, whether minimum procedural requirements have been met and, second, whether the hearing official based his decision on the evidence. The slightly adverse effect of such a requirement would be the cost and inconvenience of compliance. * * * [T]hese factors do not outweigh the prisoners' interest in protection from arbitrary or biased decisions." [57 *Va. L. Rev., supra* at 875]

represent a reasonable accommodation between the interests of the inmates and the needs of the institution. [418 *U. S.* at 571–72, 94 *S. Ct.* at 2982, 41 *L. Ed.* 2d at 960; footnote omitted]

Despite such distinctions, the combination of these cases provides an authoritative chart against which (particularly considering the extra-constitutional "fairness and rightness" standard effective in New Jersey, *Monks v. N. J. State Parole Board, supra*) we may accurately assay the sufficiency of the disciplinary standards before us.

## NOTICE

██ The first requirement of procedural due process is notice. *Wolff* requires and the Standards provide "that written notice * * * be given to the disciplinary action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense. * * * [N]o less than 24 hours should be allowed to the inmate to prepare for the appearance before the Adjustment Committee." See Standards, 254.262. Such notice of a specific alleged violation, plus the amplitude of general notice of prison rules, offenses, sanctions and the like, to which we have already referred, seem to us to fully satisfy constitutional and "fairness" requirements of notice.

## THE IMPARTIAL TRIBUNAL

██ Of importance to procedural fairness, manifestly, is the impartiality of the hearing tribunal. As pointed out in *Morrissey, supra,* such need not be, in order to be "neutral and detached," disassociated from the administrative process involved such as, in *Morrissey,* decision as to parole revocation. The Standards, in section 254.231, provide that a disciplinary hearing in the institution may be conducted either by one hearing officer or by an adjustment committee (the "hearing officer" technique has not yet been implemented and such hearings are presently conducted by the

Adjustment Committee). The Adjustment Committee is composed of at least three members designated by the institutional superintendent and drawn from the following: a supervisory correctional officer of at least the rank of Captain or Lieutenant in case of absence (or Head Juvenile Officer at the Training Schools); an institutional staff member from the medical, administrative, social work, counseling, parole, educational, treatment or chaplain's staff; a member of the correctional staff of the rank of Senior Correction Officer or a Correctional Officer in case of absence; or a staff member from the Central Office of the Division of Corrections of the Department of Institutions and Agencies. The regulation is silent as to what proportion of the committee should be drawn from each area and thus all the committee members could be drawn from but one segment of the staff.

The superintendent may designate persons to serve permanently, or on a rotating basis or on a combined permanent and rotation basis, and may designate alternates. The regulation provides that any staff member who reported, investigated or, under normal circumstances, witnessed the incident being considered may not sit as a member of the Adjustment Committee, and that any staff member who played a significant part in having the charges referred to the committee will similarly be excluded.

Measured against *Wolff, supra,* this adjustment committee meets due process requirements.[24] Beyond *Wolff,* how-

---

[24] "* * * [W]e decline to rule that the Adjustment Committee which conducts the required hearings at the Nebraska Prison Complex * * * is not sufficiently impartial to satisfy the Due Process Clause. The Committee is made up of the Associate Warden for Custody as chairman, the Correctional Industries Superintendent and the Reception Center Director. * * * The Committee is not left at large with unlimited discretion. * * * We find no warrant in the record presented here for concluding that the Adjustment Committee presents such a hazard of arbitrary decisionmaking that it should be held violative of due process of law." [418 *U. S. at* 570–71, 94 *S. Ct.* at 2982, 41 *L. Ed.* 2d at 959–60]

ever, we think the "rightness and fairness" standard now firmly established in New Jersey law would better be satisfied if two members of the Adjustment Committee were not to be selected from the correctional officer staff. The pervasive and understandable friction between correctional officers and prisoners noted in *Wolff* ought not be exacerbated by two of the three members of the "impartial tribunal" being correctional personnel. Thus, from now on there must be no more than one correctional officer on the Adjustment Committee. Ideally, the supervisory correctional officer and the institutional staff member might be joined by an institutional "outsider" such as a departmental official from the central office, or some like designee whose membership on the committee would dilute the apparent, though unintended, overbalancing of the Adjustment Committee (as presently constituted) by members of the correctional officers staff. But immediate accomplishment of an ideal solution is sometimes administratively difficult or impossible (particularly in view of judicially noticeable budgetary and personnel limitations affecting the whole institutional spectrum in New Jersey, for lack of resources). We must be content now with directing the Department to institute planning against the future day (hopefully not more than one year hence) when it will become administratively possible to place such non-institutional "neutral" on the three-person Adjustment Committee. In the interim, we direct that the third member of the Adjustment Committee shall be one other than a member of the correctional staff such as an additional person drawn from the non-correctional institutional personnel, or from whatever source such a qualified third member may be enlisted. We further think that when and if the single "hearing officer" adjudicator technique is implemented, such officer (because of the singularity of his judgmental responsibility as adjudicator) should be assigned from the central office staff instead of coming from within the institution itself. Di-

recting that these details be added to the Standards, and given the hearing and disposition requirements to which we shall later refer, we hold such tribunal to be fully compatible with the broad aspects of fairness and due process to which we have adverted.

## THE HEARING

██ The hearing is prefaced by a timely (generally within 48 hours after occurrence), adequate and specific notice of the violation charged, an inmate being given "either the copy of the disciplinary report or a summary of the details of the alleged violation." (Standard 254.262) The disciplinary report contains the following information: "the specific rule violated (set out in words as to the relevant portion).; the facts supporting the charge; any unusual inmate behavior; any staff or inmate witnesses and the disposition of any physical evidence (weapons, property, and so forth); any immediate action taken; and the reporting staff member's signature." (Standard 254.261)

██ After providing the inmate with the written charge. the investigator must also read it to the inmate and obtain his statement concerning the incident (Standard 254.263). The inmate is entitled to a hearing as soon as practicable and within one week of the alleged violation, under ordinary circumstances; if he is confined in prehearing detention, a hearing is held within 72 hours absent exceptional circumstances; whenever inmates are so confined, they are given priority in scheduling. No delays in hearing a case are permitted for the purpose of punishment or discipline and "[e]very effort is made to reach a speedy and fair disposition." (Standard 254.270) The inmate is permitted to be present throughout the hearing except during the Committee's deliberations and except where institutional security would be jeopardized. The reasons for excluding an inmate from the hearing must be "well documented" on the record. Otherwise, the hearing is conducted

in the absence of the inmate only if he refuses to appear and cannot be brought to the hearing without the use of force, or if he is on escape. In case of escape from custody, although the hearing is conducted in the inmate's absence, if sanctions are imposed (such as loss of "good time," *N. J. S. A.* 30:4–140), when and if he later returns to custody, he is advised of his right to have a hearing on the escape charge (Standard 254.271).

When the Adjustment Committee determines that an inmate is illiterate[25] or cannot adequately collect or present the evidence in his own behalf,[26] the Committee or hearing officer may choose a sufficiently competent staff member or inmate to provide assistance. Where a person is not selected by the Committee or hearing officer to aid such an inmate the latter has the right to a personal choice of a consenting staff member or inmate. Time is provided for consultation between inmate and such counsel-substitute and if necessary a defense may be presented through an interpreter (Standard 254.272). The Adjustment Committee has discretion to keep such hearing within reasonable limits, but inmates are allowed to call witnesses and present documentary evidence in their defense when such procedure will not be unduly hazardous to institutional safety or correctional goals. The Committee calls witnesses deemed to be reasonably available and necessary for proper understanding of the circumstances surrounding the charge, but repetitive witnesses need not be called and unavailable witnesses may be asked to submit written statements (Standard 254.273). The opportunity for confrontation and cross examination shall be

---

25"* * * penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited." [*Johnson v. Avery*, 393 *U. S.* 483, 487, 89 *S. Ct.* 747, 750, 21 *L. Ed.* 2d 718, 722 (1969)]

26This would obviously include immobilization due to prehearing detention (Standards 255.210, .271), hospitalization or the like.

provided to the inmate in such instances where the Adjustment Committee deems it necessary for an adequate presentation of the evidence, particularly when serious issues of credibility are involved, and procedures for evoking the necessary oral testimony are determined by the Committee chairman based on the particular circumstances (Standard 254.274).

As to the level of evidence required, disciplinary actions are not taken except where the inmate admits a rule infraction; where the inmate's involvement is supported by substantial evidence; where the inmate has created a state of facts which indicates he has deliberately failed or refused to follow the guidance of the Adjustment Committee to avoid disrupting institutional order by constantly violating institutional rules and regulations; or where there is reasonable cause to believe that an inmate's behavior has constituted a danger to person, property, security or the orderly operation of the institution (Standard 254.275).

We think these procedures and others mentioned in the Standards fully meet the requirements of *Wolff, supra,* while giving effect to its reminder of the need for caution, in avoiding excessive interference with the administrative process.[27]

---

[27]"* * *" the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of re-

With regard to an administrative hearing (disciplinary hearing as to a state trooper violation of departmental rule) our Court has held that:

Due process is not a rigid concept. Its flexibility is in its scope once it has been determined that some process is due. It calls for such procedural protections as the particular situation demands recognizing that not all situations calling for procedural safeguards require the same kind of procedure. *Morrissey v. Brewer* [citation omitted] Relevant considerations are the public interest, the rights involved and the nature of the proceeding. The manner of holding and conducting the hearing may vary. As long as principles of basic fairness are observed and adequate procedural protections afforded, the requirements of administrative due process have been met. In *Laba v. Newark Board of Education*, 23 *N. J.* 364, 382 (1957) we said: "Absent specific legislative direction, the administrative tribunals may mold their own procedures so long as they operate fairly and conform with due process principles." [*Kelly v. Sterr*, 62 *N. J.* 105, 107 (1973)]

We note that the present Standard (254.283) has adopted the recommendation in *Wolff, supra,* that the Committee "state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity or the hazards presented in individual cases" (418 *U. S.* at 566, 94 *S. Ct.* at 2980, 41 *L. Ed.* 2d at 957) and further provides that the written

prisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case. The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents. [*Wolff v. McDonnell*, 418 *U. S.* at 566–67, 94 *S. Ct.* at 2979–80, 41 *L. Ed.* 2d at 956–57]

statement of disposition indicate "the reason for refusing * * * to disclose items of evidence." We think the Standards must be amended by requiring that in those cases where the Committee "deems" confrontation and cross examination "[un]necessary for an adequate presentation of the evidence" (Standard 254.274) the reasons for such denial be entered in the record and made available to the inmate. See *Clutchette v. Procunier,* 510 *F.* 2d 613, 616 (9th Cir. 1974), *modifying* 497 *F.* 2d 809 (9th Cir. 1974). Such a requirement would appear to us to represent a more precise accommodation of the competing interests and would afford greater flexibility than would an absolute bar to or requirement of confrontation and cross examination. A further advantage to be derived from this requirement would be that compliance therewith would provide *prima facie* evidence which will enable reviewing authorities (see Standard 254.288) and, if necessary, the courts, to determine whether or not there has been a proper exercise of discretion.

Directing that such refinement be added, we hold that the hearing provided in the case of inmate disciplinary infractions is completely adequate to meet standards of "fairness" and due process.

## ₍THE DISPOSITION

 We have examined the range of sanctions which may be imposed (Standards 254.276) including the stated policy of suspension of punishment for a first time offense (254.278) and find them wholly reasonable, humane and compatible with the policy statement in the Introduction to the Standards:

Disciplinary action is one of many essential elements in correctional treatment. When applied reasonably and with fairness it not only assists in protection of the health, safety and security of all persons within a correctional facility, but also is a positive factor in rehabilitation of inmates and maintaining the morale of inmates and staff alike. No judicial decision precludes appropriate disciplinary action for misconduct that is imposed in a fair manner. Adverse court de-

cisions have been founded mainly upon what appears to have been arbitrary and capricious actions by correctional staff resulting in unwarranted loss of privileges or the imposition of unduly harsh physical conditions of confinement. Courts have approved decisions and conditions which had previously been condemned upon a showing of their necessity. [250.210]

 Although the Standards do not presently project as a possible sanction the forfeiture of "work time" earned by way of remission of sentence (*N. J. S. A.* 30:4–92), we observe that if that eventuality should ever come to pass it would fall (as does forfeiture of "good [behavior] time," *N. J. S. A.* 30:4–140) within the classification of "grievous loss" and thus within the protection of due process "fairness" rules.

 Fully comporting with the rationale of *Morrissey* and *Wolff,* as well as the "fairness" norm of *Monks, supra,* section 254.283 of the Standards provides:

*Disciplinary Decision*

After the hearing is completed, a written statement of the fact-findings is given to the inmate by the hearing officer or by the adjustment committee chairman as to the evidence relied upon, decision and the reason for the disciplinary action taken unless doing so would jeopardize institutional security. The written statement also indicates the reason for refusing to call a witness or to disclose items of evidence whether it be for irrelevance, lack of necessity or the hazards presented in individual cases.

A copy of the disciplinary decision is kept in the adjustment committee records and in the inmate's folder.

We determine that these elements of the disciplinary Standards as to disposition are fully compatible with constitution and law.

## SELF-INCRIMINATION

While not dealt with in *Wolff, supra,* we must, for a complete overview of the Standards, consider (especially in light of claims that formal counsel should be provided the inmate at the disciplinary hearing) another problem so dif-

ficult and puzzling that it has troubled many courts.[28] The issue arises in this context: it is obvious that some prison rule violations (as in *Avant v. Cahill*) project the possibility of criminal prosecution above and beyond the discipline or administrative segregation imposed under the Standards for the sake of institutional control and security. In such case there arises the dilemma of the respondent prisoner, described by Judge Arlin Adams in his unpublished opinion of July 26, 1972, for the *Avant v. Cahill* three judge court (in denying injunctive relief to plaintiffs) as follows:

The plaintiffs insist that in the narrow circumstances here, where they are faced with disciplinary charges and a criminal indictment arising out of the same factual circumstances, they are entitled to a reasonable oportunity to explain away the accusation, and that that right, of necessity, includes the right to counsel as well as to confrontation and cross examination. Otherwise, the plaintiffs urge, they will be required to choose between remaining silent at the disciplinary proceedings, thereby sacrificing their rights to defend themselves, or with speaking at such disciplinary hearings and thus risk incriminating themselves in the later prosecution of the indictments. Accordingly, they contend they are required to sacrifice one fundamental right as the price for exercising another, and that such a position is offensive to due process. The authority for this view is

---

[28]*E.g., Clutchette v. Procunier*, 497 *F.* 2d 809, 823–24, n. 23 (9th Cir. 1974), *modified* 510 *F.* 2d 613 (9th Cir. 1975), *cert.* granted *sub nom. Enomoto v. Clutchette*, —— U. S. ——, 95 S. Ct. 2414, 44 L. Ed. 2d 678 (1975) ; *Palmigiano v. Baxter*, 487 *F.* 2d 1280, 1288–89 and n. 21 (1st Cir. 1973), *modified* 510 *F.* 2d 534, 535–36 (1st Cir. 1974), *cert. granted* —— U. S. ——, 95 S. Ct. 2414, 44 L. Ed. 2d 678 (1975) ; *Crafton v. Luttrell*, 378 *F. Supp.* 521, 539 (M. D. Tenn. 1973) (*amended June* 25, 1974) ; *Fowler v. Vincent*, 366 *F. Supp.* 1224, 1227–28 (S. D. N. Y. 1973) ; *Sands v. Wainwright*, 357 *F. Supp.* 1062, 1092–93 (M. D. Fla. 1973), *vacated and remanded* (for consideration by a three-judge district court) 491 *F.* 2d 417 (5th Cir. 1973), *cert.* den. *sub nom. Guajardo v. Estelle*, 416 *U. S.* 992, 94 *S. Ct.* 2403, 40 *L. Ed.* 2d 771 (1974) ; *Shimabuku v. Britton*, 357 *F. Supp.* 825, 827 (D. Kan. 1973), *aff'd* 503 *F.* 2d 38, 44–45 (10th Cir. 1974) ; *Carter v. McGinnis*, 351 *F. Supp.* 787, 793–95 (W. D. N. Y. 1972). *Cf. Melson v. Sard*, 131 U. S. App. D. C. 102, 402 *F.* 2d 653, 654–55 (D. C. Cir. 1968) (parole revocation hearing). *See* Turner and Daniel, "Miranda in Prison: The Dilemma of Prison Discipline and Intramural Crime," 21 *Buffalo L. Rev.* 759 (1972).

an extension of the doctrine contained in *Miranda v. Arizona*, 384 *U. S.* 436; 16 *L. Ed.* 2d 694; 86 *S. C.* 1602 (1966), as announced in *Clutchette v. Procunier*, 328 *F. Supp.* 767 (N. D. Cal. 1971). The defendants contend that the application of *Miranda*, as set forth in *Clutchette*, to administrative disciplinary proceedings in a prison setting is unwarranted.

While the dilemma, from the standpoint of the inmate, has been considered to be not only "substantial" but "constitutionally obnoxious," *Sands v. Wainwright*, 357 *F. Supp.* 1062 (M. D. Fla. 1973), it is no less real to the prison administrator who must report to outside law enforcement authorities violations of criminal statutes, at least in cases of "high misdemeanors, escapes, offenses involving injuries to persons * * * and serious damage to property" (Standards 846.210, *et seq.*), and at the same time utilize prison disciplinary procedures for the sake of institutional security.

In considering alternatives to meet this dilemma, we discard at once as fatal to institutional control the abandonment of disciplinary enforcement (especially detention or protective segregation) in the light of probable criminal prosecution. For the same reason, implicating as well the procedural rights of the inmate which we have mentioned, we could not prescribe indefinite postponement of prison discipline, awaiting the sometimes slow process of criminal prosecution. The exigencies of institutional control and security would simply not permit such lag in, and risk to, the maintenance of order.

The alternative suggested by the Ninth Circuit in *Clutchette v. Procunier*, 497 *F.* 2d 809 (1974), (*Clutchette* I), and unmodified on the reconsideration of that case after *Wolff*, 510 *F.* 2d 613, 616 (1975) (*Clutchette* II), would implement *Miranda v. Arizona*, 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966) in the prison setting. Considering the "custodial" status of the inmate, it would require in California prisons the issuance of the *Miranda* warning and the concomitant assignment of formal counsel to guide the inmate at the disciplinary hearing. So too, the

First Circuit in reconsidering its opinion in *Palmigiano v. Baxter,* 487 *F.* 2d 1280 (1st Cir. 1973) (*Palmigiano* I), *vacated and remanded* 418 *U. S.* 908, 94 *S. Ct.* 3200, 41 *L. Ed.* 2d 1155 (1974), said in *Palmigiano* II, 510 *F.* 2d 534 (1974), despite *Wolff* (which had not reached the discipline-prosecution "dilemma,"), that "in cases where criminal charges are a realistic possibility, prison authorities should consider whether defense counsel, if requested, should not be let into the disciplinary proceeding, not because *Wolff* requires it in that proceeding, but because *Miranda* requires it in light of future criminal prosecution." *Id.* at 537.

Traditionally, the right to formal counsel in prison disciplinary hearings has not been considered to be of constitutional dimension. *See, e. g., Meyers v. Alldredge,* 492 *F.* 2d 296 (3rd Cir. 1974) ; *Braxton v. Carlson,* 483 *F.* 2d 933 (3rd Cir. 1973) ; *Sostre v. McGinnis,* 442 *F.* 2d 178 (2d Cir. 1971), *cert.* den. *sub nom. Sostre v. Oswald,* 404 *U. S.* 1049, 92 *S. Ct.* 719, 30 *L. Ed.* 2d 740 (1972), and *Oswald v. Sostre,* 405 *U. S.* 978, 92 *S. Ct.* 1190, 31 *L. Ed.* 2d 254 (1972). Even in the context of a disciplinary hearing in the shadow of impending criminal prosecution, the need and value of formal counsel has been doubted. "[W]hen the time comes at the hearing for the inmate proceeded against to make a statement, the assistance of counsel cannot vitiate the constitutionally obnoxious dilemma : it is then still as substantial as if the attorney were not there." *Sands, supra* at 1093. Thus the inclusion of formal counsel in the prison disciplinary hearing was thought in *Sands* to be of minimal value, was believed by Judge Kilkenny in his dissent on this point in *Clutchette* I, *supra,* to be apt to "create havoc" and was deemed in *Fowler v. Vincent,* 366 *F. Supp.* 1224 (S. D. N. Y. 1973), to be both excessive and ultimately ineffective. We think, too, that the institutional complications emphasized by Mr. Justice White in *Wolff*

are equally cogent in the "discipline-criminal prosecution" setting:

> The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings. [418 *U. S.* at 570, 94 *S. Ct.* at 2981–82, 41 *L. Ed.* 2d at 959]

We determine that the injection of a right to formal retained or assigned counsel (as opposed to the counsel-substitute accommodated by the Standards) would be wholly incompatible with New Jersey institutional needs and capacities and, as we shall mention later, unessential to protection of the inmate's rights. We therefore decline, with deference, to follow the rule announced in *Clutchette* I and II, *supra,* and suggested in *Palmigiano* II, *supra.*[29]

Yet, the question of formal counsel aside, the nagging problem remains. How may be accommodated the important parallel interests of the state in institutional se-

---

[29]*See State v. Coleman,* 46 *N. J.* 16 (1965), where this Court stated:

"In passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court." [*Id.* at 36]

We recently reaffirmed this principle in *State v. Norflett,* 67 *N. J.* 268, 286 (1975). In a similar vein, the 7th Circuit said:

"The Supreme Court of the United States has appellate jurisdiction over federal questions arising either in state or federal proceedings, and by reason of the supremacy clause the decisions of that court on national law have binding effect on all lower courts whether state or federal. On the other hand, because lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts." [*United States ex rel. Lawrence v. Woods,* 432 *F.* 2d 1072, 1075–76 (7th Cir. 1970)] *See* 28 *U. S. C.* §§ 1254, 1257.

curity and criminal prosecution[30] while offering full protection to the inmate's dual rights, *i. e.,* his right to be heard in defense or extenuation of the charge against him and his Fifth Amendment privilege against self-incrimination? The latter privilege is vulnerable at two points in the disciplinary process. At first during the preliminary investigation when, after providing the inmate with the written charge, the investigator must read it to him and "obtain his statement concerning the incident." (Standards 254.263). While not so called and perhaps not so intended, this seems not far from the concept of "custodial interrogation" isolated in *Miranda, supra.* Again, the right of the inmate to be heard at the disciplinary hearing itself, while on its face voluntary and permissive, the mere conferring of an "opportunity to explain" may certainly (considering the realistic probability of punishment in the face of silence, see *infra*) be considered to be "in actuality a subtle form of interrogation. In effect, the disciplinary committee [presenting] the evidence against the prisoner and then [saying] to him, 'And what do you have to say about that?'" *Clutchette I, supra,* 497 *F.* 2d at 823, makes the disciplinary hearing "inherently inquisitive." In this posture, we must first attend to insulating the inmate's Fifth Amendment right against self-incrimination, whether forced or inadvertent. We therefore adopt (although we do not follow that case on all points) the language of *Palmigiano II, supra:*

> We reiterate that the Fifth Amendment privilege against self-incrimination extends to an incarcerated suspect, whether or not in-

---

[30]"Obviously, many prison disciplinary offenses also constitute crimes. For example, the murder of a guard by an inmate or the beating of an inmate or another person in the prison fall within this category. Just as the state has an interest in proceeding in a criminal action against the responsible person, the prison authority continues in such a period to have an interest in preserving order in the prison and dispensing discipline to the offending inmate." [*Sands v. Wainwright, supra,* at 1092; footnote omitted]

terrogation is intended to obtain evidence for further prosecution, *Mathis v. United States*, 391 *U. S.* 1, 88 *S. Ct.* 1503, 20 *L. Ed.* 2d 381 (1968). An inmate subjected to such interrogation is entitled to be advised of his right to remain silent, and cannot be further interrogated should he choose not to speak. His silence may not be used against him at that time or in future proceedings. *Lefkowitz v. Turley*, 414 *U. S.* 70, 77, 94 *S. Ct.* 316, 38 *L. Ed.* 2d 274 (1973) ; *see Garrity v. New Jersey*, 385 *U. S.* 493, 87 *S. Ct.* 616, 17 *L. Ed.* 2d 562 (1967) ; *Spevack v. Klein*, 385 *U. S.* 511, 87 *S. Ct.* 625, 17 *L. Ed.* 2d 574 (1967). [510 *F.* 2d at 536–37]

We think this advice should be fortified (in the case of an illiterate or handicapped prisoner) by the expression of a similar caution to his counsel substitute.

But even if the Standards were to provide (as they do not now) that the silence of the inmate in the face of charges against him would not be considered by the adjustment committee in its decision, the inmate would still be required to surrender one constitutional right (to be heard) to protect another, a choice contemned by the court in *Sands, supra,* as "simply intolerable."[31] This choice becomes more critical because it must be made in the prison disciplinary setting. Unlike the rights accorded a defendant at trial, the inmate's rights to produce witnesses in his behalf and to cross examine adverse witnesses may be abridged by the Adjustment Committee. Furthermore, the burden of proof which must be sustained against the inmate is far lower than in a criminal trial. In light of the fewer procedural safeguards available and the limitations placed on the inmate's tools of defense, an inmate's decision to remain silent is tantamount to a sacrifice of his defense. Thus, the California Supreme Court in a recent opinion adopting a limited exclusionary rule to protect a probationer's right to be heard at revocation proceedings noted that, given an inmate's limited procedural rights, the "need for accommodation * * * may well be con-

[31]Other courts have viewed this problem as a necessary hardship, however. *See, e. g., Palmigiano* II, *supra* at 536; *Clutchette* I, *supra* at 823–24, n. 23.

stitutionally compelled." *People v. Coleman,* 13 *Cal.* 3d 867, 885, 120 *Cal. Rptr.* 384, 399, 533 P. 2d 1024, 1039 (Sup. Ct. 1975).

There is the additional problem of what inferences may be drawn from such a decision. The inmate's silence could not be used directly against him in a subsequent criminal prosecution to prove his guilt or complicity in the crime involved in the disciplinary charge. *Palmigiano* II, *supra,* 510 *F.* 2d at 536; *United States v. Anderson,* 162 U. S. App. D. C. 305, 498 *F.* 2d 1038, 1044 (D. C. Cir. 1974), *aff'd sub nom. United States v. Hale,* —— U. S. ——, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975). However, the role of the inmate's silence in the disciplinary hearing may be less protected from the possibility of adverse inferences which may play a part in the Adjustment Committee's deliberations. As Justice Clifford noted in his concurring opinion in *State v. Miller,* 67 N. J. 229 (1975), it may be unrealistic to expect human beings (in that case a jury) to do the impossible in mentally coping with subtle distinctions of law and fact. In summary, we do not find that the inmate's rights would be adequately protected by a ruling that his silence may not be used against him. We, therefore, hold, contrary to *Palmigiano* II, *supra,* 510 *F.* 2d at 536, that, even assuming an inmate is informed that no adverse inferences will be drawn from his silence, the "constitutionally obnoxious dilemma" remains. See *People v. Coleman, supra.*

In reconciling the competing interests involved and to reduce to an acceptable minimum the effects of the inevitable collision between the constitutional rights of the prisoner and the compelling law enforcement interest of the state (both in criminal prosecution and the maintenance of institutional security) we come to the second stage of a hybrid solution which we believe will be protective of the inmate's right to be silent or to speak as he may choose, and will further assure that such choice be an informed one.

To be free to speak in defense or extenuation, a way must be found to immunize whatever the prisoner says or

whatever evidence may be derived from what he says from use against him in a subsequent criminal proceeding for the establishment of guilt of the offense involved. As we have seen, his statement in the disciplinary process, in substance if not in form, must be regarded as "compelled" in the sense that its absence would project the "grievous loss" entailed in disciplinary punishment. The imminence of punishment affecting his liberty exposes him to a "penalty" equivalent at least to that involved in *Lefkowitz v. Turley*, 414 *U. S.* 70, 94 *S. Ct.* 316, 38 *L. Ed.* 2d 274 (1973); *Gardner v. Broderick*, 392 *U. S.* 273, 88 *S. Ct.* 1913, 20 *L. Ed.* 2d 1082 (1968); *Spevack v. Klein*, 385 *U. S.* 511, 87 *S. Ct.* 625, 17 *L. Ed.* 2d 574 (1967); *Garrity v. New Jersey*, 385 *U. S.* 493, 87 *S. Ct.* 616, 17 *L. Ed.* 2d 562 (1967); *Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation of N. Y.*, 426 *F.* 2d 619 (2d Cir. 1970), *cert.* den. 406 *U. S.* 961, 92 *S. Ct.* 2055, 32 *L. Ed.* 2d 349 (1972) [previous decision, 383 *F.* 2d 364 (2d Cir. 1967) *rev'd* 392 *U. S.* 280, 88 *S. Ct.* 1917, 20 *L. Ed.* 2d 1089 (1968)].

Testimony "voluntarily" given in the exercise of a constitutional right (as in testimony on a motion to suppress evidence under a Fourth Amendment claim of wrongful seizure) is "compelled" in the sense that if the defendant foregoes that testimony he loses the right. The Supreme Court has found it "intolerable that one constitutional right should have to be surrendered in order to assert another" and has held, for instance, that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial * * *." *Simmons v. United States*, 390 *U. S.* 377, 394, 88 *S. Ct.* 967, 976, 19 *L. Ed.* 2d 1247, 1259 (1968). Although there is at present some uncertainty regarding the scope of *Simmons, supra,* see *McGautha v. California*, 402 *U. S.* 183, 91 *S. Ct.* 1454, 28 *L. Ed.* 2d 711 (1971) and *Flint v. Mullen*, 499 *F.* 2d 100 (1st Cir.

1974), we think that the reasoning therein is relevant to the problems arising in prison disciplinary hearings, given the limited procedural rights available to a respondent inmate.

To resolve the constitutional dilemma, we adopt the solution found by other courts, and well stated in *Sands, supra*:

This Court recognizes that the threat of an imposition of solitary confinement or the loss of any type of gain time may operate to coerce a waiver of the Fifth Amendment privilege against self-incrimination and that, on the other hand, an inmate who chooses to remain silent is stripped of his most valuable defense. In either event, the dilemma is "* * * likely to exert such pressure upon an individual as to disable him from making a free and rational choice." *Miranda v. Arizona*, 384 *U. S.* 436, 464–465, 86 *S. Ct.* 1602, 1623, 16 *L. Ed.* 2d 694 (1966). Therefore, this Court concludes and holds that, with regard to testimony given at any type of prison disciplinary proceedings including those in which the grievous loss is, as heretofore defined, punitive segregation, administrative segregation or the loss of any type of gain time, the inmate therein proceeded against is in each such case entitled to "use" immunity in a subsequent criminal prosecution to the extent that his statements shall not be used affirmatively against him. * * * It is simply intolerable that one constitutional right should have to be surrendered in order to assert another.

The result of this rule accommodates the interests of the parties as well as justice. The inmate is free to be heard in his defense in the disciplinary proceedings while the state is free to promote prison discipline and to protect its interest in the prosecution of crime. [357 *F. Supp.* at 1093; citations omitted]

By way of further refinement, the immunity from use of the prisoner's statement should extend to evidence derived directly or indirectly therefrom (the "fruits" thereof). *Ullmann v. United States*, 350 *U. S.* 422, 76 *S. Ct.* 497, 100 *L. Ed.* 511 (1956); *Kastigar v. United States*, 406 *U. S.* 441, 92 *S. Ct.* 1653, 32 *L. Ed.* 2d 212, *reh. den.* 408 *U. S.* 931, 92 *S. Ct.* 2478, 33 *L. Ed.* 2d 345 (1972).

But it must be quite clear that we are not here speaking of "transactional immunity" unauthorized in this setting by any statute and completely discordant, in any case, with the

just and compelling interest of the state[32] in the prosecution of crime. The distinction is stated in *Kastigar*:

The statute's explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-discrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to * * * criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. [406 *U. S.* at 453, 92 *S. Ct.* at 1661, 32 *L. Ed.* 2d at 222; footnote omitted]

The use immunity to which we refer is "relatively costless" since "the government, as prosecutor, is in substantially the same position * * * as it would have been if the witness [respondent prisoner] had insisted on remaining silent." *Uniformed Sanitation Men Ass'n, Inc., supra,* 426 *F.* 2d at 628; *Murphy v. Waterfront Comm'n of N. Y.,* 378 *U. S.* 52, 84 *S. Ct.* 1594, 12 *L. Ed.* 2d 678 (1964).

Nor, as indicated in *Sanitation Men* (426 *F.* 2d at 627–28), need this limited immunity be based on statutory authority or be "conferred" by the Adjustment Committee for, given the "compelled" nature of the testimony or statement of the prisoner (associated as it is with his surrender of

[32]"In many instances a grant of transactional immunity may be against the interests of the government; it follows that only those in a position to weigh the advantages, if any, against the disadvantages, should be authorized to confer it." [*Uniformed Sanitation Men Ass'n, Inc., supra,* 426 *F.* 2d at 628]

the right to be silent), his Fifth Amendment protection against self-incrimination is, in a sense, self-executing in that it protects him from subsequent use against him of the same in a criminal proceeding. In another context, but answering a suggestion that the court was extending an immunity which only the legislature could provide, Chief Justice Weintraub has said:

The question is not troublesome. The court does not trade an immunity for the witness's testimony. Indeed the witness remains triable for the prior crime. Rather the court honors the privilege when its genuineness appears by shielding the witness from the very self-injury against which the privilege was intended to protect. It is nothing but an application of a principle, which seems nowhere to be denied, that if the privilege is improperly denied or ignored the testimony may not be used against the witness. [*State v. DeCola*, 33 *N. J.* 335, 352-53 (1960)]

It must further be noted that the prisoner (and his counsel-substitute where appropriate) must be advised both at the disciplinary hearing and at the investigative interview which precedes it, not only of his right to remain silent but also of his right to make a statement concerning the charge, and of the existence and consequences of the use immunity we have described. The necessity of such disclosure of the shield of use immunity is not the "granting" thereof but it is "merely advising [those accused] of the constitutional limitations on any criminal prosecution should they answer." *Confederation of Police v. Conlisk*, 489 *F.* 2d 891, 895, n. 4 (7th Cir. 1973), *cert.* den. *sub nom. Rochford v. Confederation of Police*, 416 *U. S.* 956, 94 *S. Ct.* 1971, 40 *L. Ed.* 2d 307 (1974). And respondents must be "informed that any information which they [give] would not be used against them in criminal proceedings." *Id.* at 895. For the informed choice essential to constitutional protection, Chief Judge Friendly said in *Uniformed Sanitation Men Ass'n, Inc., supra,* that the respondent must be "duly advised of his options and the consequences of his choice" and be "assured of protection against use of his answers or their fruits in

any criminal prosecution * * *." *Id.* at 626, 627. In *Kalkines v. United States,* 473 *F.* 2d 1391, 200 Ct. Cl. 570 (1973) it was held that the respondent must be informed, *inter alia,* that "his replies (and their fruits) cannot be employed against him in a criminal case." *Id.* at 1393.

In *Fowler v. Vincent, supra,* in approving the "device of use immunity," *i. e.,* that "any statements made by a prisoner at a disciplinary proceeding could not be used affirmatively against him in a subsequent criminal prosecution," the court held that "[t]he conferring of use immunity under these circumstances is consistent with, if not mandated by the Supreme Court decisions commencing with *Garrity v. New Jersey,* 385 *U. S.* 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967) * * *" and was "preferable to any system of mandatory assignment of counsel because it fully protects the prisoner's right against self-incrimination and yet permits the prison disciplinary system to retain a speed and flexibility which should not be encumbered by excessive procedural formality." *Fowler v. Vincent, supra,* 366 *F. Supp.* at 1227, 1228. That court therefore concluded "that a prisoner who faces both intramural disciplinary proceedings and criminal prosecution must be informed by the prison disciplinary authority that use immunity will protect all statements relevant to the proceedings from subsequent use in any coordinate criminal prosecution" and that "[t]he teaching of *Garrity,* as well as its progeny, is that the Fifth Amendment will imply a grant of use immunity upon a person faced with a choice between self-incrimination and the relinquishment of a fundamental interest." *Id.* at 1228.

It is instructive to note that in *Fowler* the court held that "[t]he disciplinary proceeding here in question was thus constitutionally defective in its failure to advise Fowler of the nature and extent of the use immunity available to him." *Id.* In sum, then, we adopt the holding of *Palmigiano* I as follows:

We need not enter into a balancing equation concerning the right to remain silent, however, because another route is open which would

protect the inmate from self-incrimination in a subsequent criminal prosecution, while imposing no burden upon the prison disciplinary hearing. Where the possibility exists of the inmate being penalized for the same criminal conduct in a disciplinary hearing and a criminal trial, he should be entitled to "use" immunity for statements he might make within the prison disciplinary hearing. *See Sands v. Wainwright, supra,* 357 *F. Supp.* at 1093; *Carter v. McGinnis, supra,* 351 *F. Supp.* at 793; *cf. Melson v. Sard,* 131 *U. S. App. D. C.* 102, 402 *F.* 2d 653, 655 (1968); *Kastigar v. United States,* 406 *U. S.* 441, 92 *S. Ct.* 1653, 32 *L. Ed.* 2d 212 (1972). The provision of use immunity reflects a rational accommodation between the imperatives of the privilege against self-incrimination and the legitimate requirements of prison disciplinary procedures. In order for this immunity to be helpful to the inmate, however, it would be necessary that he be informed of its existence and its consequences at the prison disciplinary hearing. [487 *F.* 2d at 1289–90]

The standards must be amended to conform to the foregoing determinations. Given such corrections, we hold them in total context to be wholly protective of the constitutional rights involved.

## SPECIFIC STANDARDS

 Part of the complaint about the standards has concerned their vagueness, which no doubt was a valid objection to some of the former standards. By the revisions effective March 24, 1975, however, these defects have been substantially corrected. "Insolence" has become "using abusive or obscene language to a staff member," Standard 251.263.304; "possession of weapon" has been replaced by "possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, or unauthorized tool," 251.263.202; "possession of narcotics" and "possession of unauthorized controlled medication" have been replaced by "possession, introduction, or use of any narcotic paraphernalia, drugs, or intoxicants not prescribed for the individual by the medical staff," 251.263.203; "contraband" is now defined as "possession of anything not authorized for retention or receipt by the inmate, and not issued to him through regular institutional channels," 251.263.208.

The present standards contain many other improvements by way of specificity, and we discern no constitutional or other fault in this respect.

## LEGISLATIVE DELEGATION OF AUTHORITY

One of the grounds for abstention of the three-judge court in *Avant v. Cahill* was its doubt as to the presence of sufficient, indeed any, standards or guidelines in the legislative grant of power to the Commissioner to determine general policy and to promulgate rules and regulations pertaining to administration of the correctional institutions of the state, *N. J. S. A.* 30:1–12, *supra,* and the equally nonspecific delegation of authority from the Commissioner to the Department's division directors under *N. J. S. A.* 30:1–9. It was upon the basis of this apparent vacuum that was predicated that court's understandable concern as to the validity of this delegation of authority under New Jersey law.[33] And it is upon this same supposition that is erected the strong argument here that the Legislature has thus delegated to the Commissioner and the Department "the power to define the nature of imprisonment," without standards or guidelines. But considered from the perspective of reenactment of this broad statutory charter in 1971 (*N. J.*

---

[33]"The Legislature may not abdicate, transfer, assign or delegate to some governmental instrumentality, agency or public official, the power or function to make findings of fact, or subordinated rules or orders, or both, without defined standards and policies prescribed by it. *Veix v. Seneca Building & Loan Ass'n of Newark,* 126 *N. J. L.* 314 (1941) ; *State v. Hotel Bar Foods,* 18 *N. J.* 115 (1955) ; *Assn. of N. J. State College Faculties, Inc. v. Bd. of Higher Ed.,* 112 *N. J. Super.* 237 (1970). Legislature has power to vest large discretion in agency charged with administration of law enacted in pursuance of police power to secure health and safety of people, it being necessary only that statute establish sufficient basic standard; that is, definite and certain policy and rule of action for guidance of administrative agency. *State Board of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504 (1935)." [*Avant v. Cahill,* Civil Action No. 1883–71, (D.N.J. Nov. 3, 1972) at 7, n. 5]

*S. A.* 30:1–12, *supra,* amended *L.* 1965, *c.* 59, § 1; *L.* 1971, *c.* 384, § 8), and the legislative plan as it presently exists (including the significant procedure outlined by *L.* 1975, *c.* 95 (Senate Bill 762, *supra*)) one sees a whole spectrum of purposes, standards, guidelines and goals for imprisonment and corrections, binding on the administrator of the legislative will and directing him unerringly to the fulfillment of the legislative purpose.

Thus the nature of imprisonment, within this statutory pattern, includes confinement in the institutions by way of punishment for crime, *N. J. S. A.* 2A:85–6, –7 (1951); discouragement of recidivism, 2A:85–8, –9, –12; rehabilitation by way of incentive, 30:4–140; institutional work, 30:4–92, and work-release, 30:4–91.3; thrift, 30:4–91.4; education, 30:4AA–2 *et seq.,* and parole, 30:4–106. It includes mental care, 30:4–82; hospitalization, 30:4–7, including transfer for such purpose to a non-correctional institution, 30:4–84; separation of prisoners by age, 30:4–147; subjection of various classes of prisoners to indeterminate confinement, 30:4–148; and "compassionate" leave, 30:4–8.1, .2. It includes a multitude of references to the rights of prisoners including parole from certain correctional institutions other than the state prisons by institutional boards of trustees, 30:4–106; written correspondence between inmates and the "outside" in other languages as well as English, 30:4–8.3; the providing of consent for medical, psychiatric, surgical or dental treatment to certain inmates, 30:4–7.2, with requisite certification of emergency, 30:4–7.3, and on notice to parent or guardian of such inmate, 30:4–7.4; and provisions for the use, benefit and general welfare of inmates, as by maintenance of commissary and the like, 30:4–15.

The statutes place specific and heavy burdens upon the Commissioner and Department such as the observation and classification of prisoners, 30:4–81; for personal contact by the Commissioner by way of visitation and otherwise to all institutions so that he will be continually "informed con-

cerning the general condition and progress of the several institutions * * * and the general results of the management thereof and the condition and welfare of the inmates * * *." 30:1–13. The Commissioner and the Department also have responsibilities for the providing of prison industry employment in the correctional institutions, 30:4–92 *et seq*.

It would unduly burden this record to document the multitude of other items in the statutory pattern of legislative guidelines (legislative superintendence being always fluid and continuing, *e. g., L.* 1975, *c.* 95 (Senate Bill 762, *supra*)) but it is in the context of that elaborate legislative scheme that the Commissioner exercises the authority given him by *N. J. S. A.* 30:1–12, *supra*. Added to this, of course, must be considered his inherent authority for the maintenance of discipline, and the promulgation of reasonable rules to that end, which necessarily accompanies the legislative assignment to him of responsibility for the governance of the institutions. *State v. Tise,* 283 *A.* 2d 666, 668 (Me. Sup. Jud. Ct. 1971) ; 72 C. J. S. *Prisons* § 18, at 872 (1951).

It is in this posture that we must ask ourselves as did our Court in *Ward v. Scott,* 11 *N. J.* 117 (1952), whether the legislative purpose appears clear and appropriately expressed or whether on the contrary the Legislature has vested "unbridled or arbitrary power in the administrative agency [without furnishing] a reasonably adequate standard to guide it." *Id.* at 123. And it is in the setting of these questions that we must resolve whether the Legislature had "power to act" as it did (*Two Guys from Harrison, Inc., supra*) or whether the charter legislatively granted the Commissioner and the Department so "plainly exceeds the constitutional power of the Legislature that we must adjudge it invalid" (*Thomas v. Kingsley, supra,* 43 *N. J.* at 530), being "so devoid of arguable merit as to exceed the constitutional restraints upon the Legislature." *A. & B. Auto Stores of Jones St., Inc., supra,* 59 *N. J.* at 19. As pointed out in *Ward v. Scott, supra,* 11 *N. J.* at

123–24, "the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power," to such an extent that our Board of Public Utilities, for instance, is guided by simple standards such as "public convenience and necessity" and "just and reasonable" rates, as is the comparable agency in the federal sphere (*Federal Power Comm'n v. Hope Natural Gas Co.*, 320 *U. S.* 591, 600, 64 *St. Ct.* 281, 287, 88 *L. Ed.* 333, 344 (1944)). *Ward* recounts other instances of undetailed standards deemed sufficient to meet the non-delegation rule, such as "excessive profits," prices yielding "fair return," "unfair methods of competition" and the like (11 *N. J.* at 124–25). In *Ward*, Justice Jacobs held that "[i]n dealing with the question of standards it is elementary that we are not confined to the specific terms of subsection (d) but must examine the entire act in the light of its surroundings and objectives," and agreed that "'[a] statute often speaks as plainly by inference, and by means of the purpose which underlies it, as in any other manner. That which is clearly implied is as much a part of the law as that which is expressed.'" *Id.* at 123, quoting from *Brandon v. Montclair*, 124 *N. J. L.* 135, 143 (Sup. Ct. 1940), *aff'd* 125 *N. J. L.* 367 (E. & A. 1940).

Again, this Court held in *Schierstead v. City of Brigantine*, 20 *N. J.* 164, 169 (1955), that:

> In ascertaining the presence of standards and norms to support delegated powers, it is fundamental that we are not confined to the four corners of the particular section under consideration but are obligated to examine the entire act in the light of its surroundings and objectives. Nor need the standards be set forth in express terms, if they may reasonably be inferred from the statutory scheme as a whole.

The Third Circuit has dealt with a question such as here involved in *United States v. Berrigan*, 482 *F.* 2d 171 (1973), recalling that:

The power to fashion rules governing the movement of contraband as it relates to the federal prison system resides with Congress. Implementation of congressional enactments in this sphere, such as § 1791, is the duty of the Attorney General. In this case, the Attorney General has delegated this power of implementation to individual prison wardens. The crucial flaw in this scheme, appellants suggest, is that this particular statute contains no guidelines or standards to regulate the Attorney General's authority, and, as such, is simply a naked grant of power. Accordingly, appellants rely upon the principle that Congress cannot delegate unfettered discretion to administrative agencies to promulgate regulations enforceable by criminal sanctions, and the corollary that the exercise of administrative ability must be governed by the guidelines provided by Congress. [482 *F.* 2d at 182]

In rejecting this argument, *Berrigan* followed the holding of Chief Judge Murrah writing for the Tenth Circuit in *Carter v. United States,* 333 *F.* 2d 354 (1964), that:

In the exercise of its law-making function, Congress has committed to the Attorney General the "control and management" of Federal penal and correctional institutions, and has vested him with the duty and authority to "promulgate rules for the government thereof." 18 *U. S. C.* § 4001. In the performance of his statutory duty, the Attorney General undoubtedly may provide by regulation that nothing shall be brought into or taken out of a Federal penal institution without the knowledge and consent of the warden or superintendent of such institution. [333 *F.* 2d at 355-56]

The need for standards of any specificity has been denigrated, Davis, *Administrative Law,* § 2.05 at 35 (3rd ed. 1972), on the basis that "today's governmental undertakings are * * * complex;" agencies are "better equipped * * * for weighing intangibles by 'specialization and insight gained through experience' " (*Federal Communications Comm'n v. RCA Communications, Inc.,* 346 *U. S.* 86, 96, 73 *S. Ct.* 998, 1005, 97 *L. Ed.* 1470, 1479 (1953)); and "typically, the protections lie much less in standards than in frameworks of procedural safeguards, plus executive, legislative or judicial checks." Davis, *supra,* § 2.05 at 135. Our cases have tended toward the heavier emphasis on safeguards of the latter type, *see, e. g., Burton v. Sills, supra,* 53 *N. J.* at

91, no doubt because they accommodate necessary flexibility and accountability for conformance to intelligible principle and legislative will, such as mentioned in *Amalgamated Meat Cutters & Butcher Work. v. Connally,* 337 *F. Supp.* 737 (D. D. C. 1971). In that case it was noted that "[t]he legislative power granted to Congress by the Constitution includes the power to avail itself of 'the necessary resources of flexibility and practicality * * * to perform its function.'" *Id.* at 746.

It was stated by Chief Justice Taft in *Hampton v. United States,* 276 *U. S.* 394, 409, 48 *S. Ct.* 348, 352, 72 *L. Ed.* 624, 630 (1928), that "[i]f Congress shall lay down by legislative act an intelligible principle to which the person or body authorized * * * is directed to conform, such legislative action is not a forbidden delegation of legislative power." This for the reason that "[t]he Constitution as a continuously operative charter of government does not demand the impossible or the impracticable." *Yakus v. United States,* 321 *U. S.* 414, 424, 64 *S. Ct.* 660, 667, 88 *L. Ed.* 834, 848 (1944). "Congress is free to delegate legislative authority provided it has exercised 'the essentials of the legislative function' — of determining the basic legislative policy and formulating a rule of conduct." *Amalgamated Meat Cutters, supra* at 746. The key question has been said to be "not * * * that the authority delegated is broad * * *. The issue is whether the legislative description of the task assigned 'sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will.'" *Id.* at 746, quoting *Yakus, supra,* 321 *U. S.* at 425, 64 *S. Ct.* at 668, 88 *L. Ed.* at 849.

In considering absence or paucity of standards in the specific section granting authority to the Commissioner and Department, other elements are relevant — policy, background factors and statutory context. Thus in *Lichter v.*

*United States*, 334 *U. S.* 742, 68 *S. Ct.* 1294, 92 *L. Ed.* 1694 (1947) it was said:

It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. * * * Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. "They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear." American Power & Light Co. v. S.E.C., 329 U. S. 90, 104, 67 S. Ct. 133, 141, 91 L. Ed. 103. [334 *U. S.* at 785, 68 *S. Ct.* at 1316–17, 92 *L. Ed.* at 1726]

We agree with the reasoning of the court in *Amalgamated Meat Cutters, supra,* that:

Concepts of control and accountability define the constitutional requirement. The principle permitting a delegation of legislative power, if there has been sufficient demarcation of the field to permit a judgment whether the agency has kept within the legislative will, establishes a principle of accountability under which compatibility with the legislative design may be ascertained not only by Congress but by the courts and the public. That principle was conjoined in *Yakus* with a recognition that the burden is on the party who assails the legislature's choice of means for effecting its purpose, a burden that is met "[o]nly if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." [337 *F. Supp.* at 746; footnotes omitted]

As otherwise stated by a New Jersey court, there can be "no unconstitutional delegation of legislative authority as long as the administrative discretion is hemmed in by standards sufficiently definitive to guide its exercise," such standards not necessarily being stated "in express terms if they may be reasonably inferred from the statutory scheme as a whole. *In re Berardi*, 23 *N. J.* 485 (1957)." *Assoc. of N. J. State Col. Fac. v. Bd. of Higher Ed.*, 112 *N. J. Super.* 237, 258, 259 (Law Div. 1970).

Upon this reasoning it is clear that the control and governance of the correctional institutions and rule making in the

course thereof, confided by law to the Commissioner and Department, are in no way unconfined by adequate legislative determinations with regard to objectives and goals, standards and guidelines pertaining to imprisonment and the correctional process in New Jersey. It is unthinkable that the Department or Commissioner would or could depart from those legislative strictures, such as by freeing prisoners adjudged to be confined or cancelling rehabilitative programs legislated to be in effect or otherwise acting discordantly with the legislative plan.

Such variations, as well as violations of basic constitutional rights, would promptly be met with judicial overthrow and that, predicated not only on constitutional right, but on the statutory pattern guiding imprisonment and corrections, within the well-charted confines of which the Commissioner and the Department fulfill their delegated mission.

We therefore hold that the legislative delegation of authority here involved is constitutionally unassailable.

## ADMINISTRATIVE PROCEDURE ACT

Another basis for abstention of the three-judge federal court in *Avant v. Cahill* was its doubt as to the status of New Jersey law, stemming from the plaintiffs' insistence, repeated here (and particularly stressed by the *amicus* New Jersey Association on Correction), that the formulation of rules and regulations by Commissioner and Department was subject to the Administrative Procedure Act; and that since the formalities of that Act had not been observed, the rules and regulations were invalid for that reason.

The Administrative Procedure Act, *N. J. S. A.* 52:14B-1, *et seq.* (*L.* 1968, *c.* 410, eff. Sept. 1, 1969), was of course in effect when the challenged Standards were adopted. In *Beckworth v. New Jersey State Parole Board,* 62 *N. J.* 348 (1973), Justice Jacobs briefly referred to its significant legislative history:

When that Act was originally passed by the Legislature and submitted to the Governor it contained very clear and comprehensive language exempting boards concerned with "the management, confinement, discipline or release of inmates" of penal or correctional institutions. The Governor conditionally vetoed the bill in a message which noted that the exemption evidenced the Legislature's awareness that, while requirements for publication of rules and for notice and hearing were appropriate in matters affecting the general public, they were neither necessary nor proper to the internal operations of institutions. He recommended that the Legislature "enlarge" its exemption to include educational and medical as well as correctional institutions.

Pursuant to the Governor's recommendation the Act was amended and enacted in its present form to exempt all State agencies whose primary responsibility is the management or operation of an "educational, medical, mental, rehabilitative, custodial, penal or correctional institution or program, insofar as the acts of such agency relate to the internal affairs of such institution or program." *N. J. S. A.* 52:14B–2(a). Notwithstanding this alteration in the language, we believe that it is fairly to be inferred from the enlightening history that the Administrative Procedure Act was never intended to apply to parole release proceedings conducted in accordance with Title 30. [*Id.* at 357–58]

When the Legislature so reenacted the bill to become the Administrative Procedure Act it persisted in exempting, *inter alia,* the penal and correctional institutions of the State from subjection to the Act, having then before it in the Governor's conditional veto message his reminder of the salutary purposes of public involvement, in general, in the administrative process:

Its [the Act's] primary thrust is to permit greater public participation in and familiarity with administrative processes, by requiring advance notice of the intention to promulgate rules and by requiring notice of hearings containing information of assistance to participants in such hearings. Such a measure can be of inestimable value in promoting public understanding of and cooperation with the State Government. [Governor's Veto Messages 1965–69, p. 126, Sen. 667, Dec. 27, 1968]

With this background in mind, we see no basis for speculation that the Legislature meant other than it said when it exempted from subjection to the Administrative Procedure Act agencies bearing responsibility for the management and

operation of penal and correctional institutions. Other states, like New Jersey, have so exempted such institutions: Indiana, *Burns' Ind. Stat. Ann.* § 4–22–1–2 (Code Ed. 1974) (reformatory or penal institutions); Georgia, *Ga. Code Ann.* § 3A–102(a) (1975) (the Board of Corrections and its penal institutions); Maryland, *Md. Ann. Code,* art. 41, § 244(a) (Supp. 1974) (the Department of Parole and Probation); Massachusetts, *Mass. Gen. Laws Ann.* ch. 30A, § 1(2) (Supp. 1975) (the department of correction); Minnesota, *Minn. Stat. Ann.* § 15.0411, subd. 2 (Supp. 1975) (Minnesota corrections authority); North Dakota, *N. D. Cent. Code Ann.* § 28–32–01(2) (Replacement Vol. 1974) (management, confinement, discipline, or release of inmates of any penal institution); Wisconsin, *Wisc. Stat. Ann.* § 227.01(5)(h) (Supp. 1974) (management, discipline or release of persons who are committed to state institutions); Iowa, *Iowa Code Ann.* § 17A.1(3) (Supp. 1974) (management, discipline, or release of any person committed to any state institution).

In California the correctional system was held exempt from the Administrative Procedure Act (with respect to the formulation of disciplinary rules) even though not exempted therefrom *eo nomine, American Friends Service Committee v. Procunier,* 33 *Cal. App.* 3d 252, 109 *Cal. Rptr.* 22 (1973).

Concerning the further condition of exemption, namely of the acts of such penal and correctional agencies "insofar as [they] relate to the internal affairs of such institution or program," we think the formulation of rules and procedures for internal institutional discipline, so inextricably involved in and vital to the fulfillment of responsibilities for institutional governance, are clearly embraced within the concept "internal affairs." In passing we note the association in the statute itself of concepts of "internal management" and "discipline." *N. J. S. A.* 52:14B–2(e).

We hold that the acts of defendants-respondents, in the matters at issue, are exempt from subjection to the requirements of the Administrative Procedure Act.

## PUBLIC INVOLVEMENT

One further issue remains. It is argued that even if those charged with the governance of penal and correctional institutions are exempted formally from the operation of the Administrative Procedure Act, that, nevertheless, under rights implied in the First and Fourteenth Amendments to the Constitution, the public should be involved with decisions as to the content of such rules and regulations before their promulgation.

Thus is reasoned the contention that, on the basis of constitutional right, "robust debate" in the public forum should precede and justify final promulgation of prison rules and regulations such as the disciplinary Standards here involved. The Commissioner and Department, on the other hand, contend that

the rules are confined to the prison and affect only the inmates. They do not affect the public, in general, nor govern the conduct of the public, nor impose any burdens on the public, nor create any rights in the public.

The complainant thesis has a very wide scope ranging from implications that the Commissioner considers his power as "plenary," to suggestions that prison regulations are deemed by him as beyond "constitutional scrutiny," that courts are not intervening because of the "hands off" theory, that there is some institutional design to interfere with information to the public or that there is resistance by prison administrators, albeit they are public officials, to accountability to the public. Added to these are many other arguments, some of which we cannot identify as being justifiably in the case at all, viewed at least from the perspective of the "healthy sense of realism" we have mentioned.

In point of fact, the "hands off" doctrine has been long discredited, and the courts have been prodigal[34] in their attention to alleged violations of constitutional right (including "prison rights" cases), as shown by the surfeit of judicial decisions in recent years, so well known and numerous that they need not be cited to add to this already overlong opinion. The window of press and public scrutiny of those secret places in which wrong and injustice may fester has been opened. *See Saxbe v. Washington Post Co.*, 417 *U. S.* 843, 846–48, 94 *S. Ct.* 2811, 2813–14, 41 *L. Ed.* 2d 514, 518–19 (1974); *Procunier v. Martinez, supra; Nolan v. Fitzpatrick*, 451 *F.* 2d 545 (1st Cir. 1971).

Moreover, and fortunately, there is no lack of organizational interest in prison justice, inmates' rights and the goals of correction both during and after imprisonment. These include activities which are intramural (Inmates' Rights committees, Inmate Coalitions, etc.), statutory (Office of Inmate Advocacy, *supra*), the interest of national organizations such as the American Correctional Association, National Council on Crime and Delinquency and the like; of citizen groups such as the *amicus* New Jersey Association on Correction; of prison visitation groups such as the Alston Wilkes Society;[35] offender assistance organizations like the Fortune Society and the American Friends Service, *supra;* bar association-oriented groups such as the American Bar Association Commission on Correctional Facilities and Services and the Correctional Reform Committee of the New Jersey State Bar Association. The latter operates, for instance, at the Rahway State Prison (scene of the genesis of

---

[34]In 1930 the number of post-conviction motions and petitions filed by state prison inmates (in the federal courts) was less than 100, where as in fiscal year 1972 12,088 were filed, to which were added 4,179 filed by federal prisoners. Ann. Rep. of Dir. of Adm. Office of U. S. Courts, Table 17, at II–29 (1972).

[35]Based in South Carolina, this Society numbers some 6,000 members, and is said to be the largest prisoner aid organization in the world; *see* Fox, *Introduction to Corrections* (1972).

this case) an "Office of Inmate Legal Services" manned by paid lawyers and other personnel and supported by grants from the Law Enforcement Assistance Administration and the State Law Enforcement Planning Agency.

While it is encouraging to note the interest of these and many other groups (and we hope it will continue and intensify), there has been in the past an imbedded and general public disinterest in correctional reform and the providing of improved correctional facilities and programs, particularly when they involve additional expenditure of funds. An example has been the inability of New Jersey to replace its aged State Prison at Trenton (vintage 1836, described as "one of the most archaic in the United States"), as recommended authoritatively more than a half century ago; *see* James V. Bennett, "Evaluating a Prison," *The Annals of the Academy of Political and Social Science* (May 1954) ; Austin H. MacCormick, "Behind the Prison Riots." *Id.* The United States Bureau of Prisons in its *Handbook of Correctional Institution Design and Construction* (1949) at page 39, commented that New Jersey "has plodded along with an antiquated and overcrowded plant for nearly eighty years and still has this penal mosaic as a millstone about the neck of one of the most enlightened systems of correctional institutions and administration in the country." Yet in 1975 the Trenton State Prison still stands, like an unyielding Chateau d'If, impervious to the storms of criticism which have swirled about it and beat in vain against its ancient walls.

In the interest of true correctional reform, we think the dissipation of this public apathy, the awakening in a sense of the public conscience, should be the prime subject and goals of "robust debate" and wide discussion in the marketplace of public opinion. This, it seems to us, would be far preferable to public wrangling as to the nature of rules and regulations to be promulgated which, in any event (despite the exemption referred to), are now voluntarily be-

ing published in the New Jersey Register for inclusion in the New Jersey Administrative Code. We commend this voluntary publication for in the natural course public suggestions will be forthcoming as to the operation of the rules, looking to their steady improvement, such as in meeting new problems and needs. Such rules and regulations are, as in this very case, always subject to judicial scrutiny (and their improvement during a proceeding such as this does not moot the issue, "since the policy can at any time be changed," *Nolan v. Fitzpatrick, supra*). And if those standards, now fully in public view should deteriorate, the courts are open to the seeking of relief.

The possibility that public disputation before the event, as to the adoption of rules, might impede the "speed and flexibility" essential to the disciplinary process is of minor relevance. We disavow any purpose in this Court to restrain or discourage public discussion or suggestion at any stage or at any time, with regard to the promulgation of disciplinary procedures. By the same token (and without qualifying the foregoing) we do not assume to contravene the legislative purpose (the Administrative Procedure Act, *supra*) that public notice, hearing, debate or authorization not be conditions precedent to the valid adoption of such rules and regulations, as elements of the "internal operations" of penal and correctional institutions. To mandate otherwise, on supposititious First Amendment grounds, would not only subvert the legislative purpose but would trifle with a dangerous possible misunderstanding, as suggesting an essential division of authority in the governance of the institutions. For no matter the scope of involvement of the inmate or the outside public in the encouragement of reform, the control and management of the institutions by the Commissioner and Department must be unitary and exclusive, subject only to legislative rule as to standards and appropriations and to judicial overview as to respect for constitutional right and administrative fairness.

It must be remembered that prisons and correctional institutions are not quiet monasteries.[36] Their security and order are peculiarly dependent upon a system of swift, stern, unmistakable and yet fair disciplinary justice. That measure of control is as important to protecting the right to safety of the peaceful inmate population as to that of the correctional staff inside and the public outside. In fact, inmates are the more vulnerable to the intractable conduct of the violent prisoner, and even with disciplinary enforcement it is sometimes impossible to contain tragic eruptions of hideous violence and disorder. *E. g., State v. Clark,* 128 *N. J. Super.* 120 (App. Div. 1974), aff'd 66 *N. J.* 339 (1975); *Travis v. Pinto,* 87 *N. J. Super.* 263 (Law Div. 1965); *Attica, The Official Report, supra.*

The undivided responsibility and authority of Commissioner and Department for the maintenance of security and order in the institutions represent an interest of the state as compelling as is the enforcement of law in general. "One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Procunier v. Martinez, supra,* 416 *U. S.* at 412, 94 *S. Ct.* at 1811, 40 *L. Ed.* 2d at 239 [footnote omitted].

In the interest of the peace and well-being of society this phase of the administration of criminal justice, consistent with constitutional and other rights of prisoners,

---

[36]"Until men willingly forego their freedom and group harmony automatically arises among criminals held captive, the free community will press for institutional controls which will insure custody and the maintenance of order." Sykes, *The Society of Captives* (1958).

must remain in the responsible hands of those to whom the Legislature has confided it.

Although we dismiss the attack upon the Standards for the reasons we have noted, we think it appropriate to mention that the participation herein of all litigants has served well the administration of justice, particularly in the areas of constitutional right and correctional reform.

The decision of the Commissioner is modified, and as so modified affirmed.

PASHMAN, J. (concurring and dissenting). I am in substantial accord with the thorough and comprehensive opinion of the Chief Justice. I am obliged to differ on only two points.

First, I join in the views expressed by Judge Conford in his concurrence as to the rights of the public to be informed of the proposed promulgation of rules concerning prison discipline by the Department of Institutions and Agencies and to engage in public debate over their wisdom and propriety.

Second, I reject the view of the majority that standards of due process and administrative fairness are satisfied by providing the prisoner accused of disciplinary infractions the opportunity to confront and cross-examine his accusers only "in such instances where the Adjustment Committee deems it necessary for an adequate presentation of the evidence." *Ante* at 530. Confrontation and cross-examination are the fundamental mechanisms for ascertaining truth in our adversary system. Professor Wigmore has aptly observed:

For two centuries past, the policy of the Anglo-American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.

\* \* \* \* \* \* \* \*

[Cross-examination] is beyond any doubt the greatest legal engine ever invented for the discovery of truth. * * * If we omit political considerations of broader range, then cross-examination, not trial by jury, is the great and permanent contribution of the Anglo-American system of law to improved method of trial procedure.
[5 *Wigmore, Evidence*, § 1367 at 32 (Chadbourne ed. 1974) ; footnotes omitted].

To deny the accused prisoner the opportunity to cross-examine his accusers is to substantially gut his right to a hearing.

Only in the situation where there is a real and substantial danger of violent reprisal would I permit this right to be truncated, and then only upon a specific statement in the record of the factual basis for the belief by the prison authorities that such a danger exists.

Justice Marshall has thoroughly canvassed this issue in his dissent to *Wolff v. McDonnell*, 418 *U. S.* 539, 583–90, 94 S. Ct. 2963, 2988–91, 41 *L. Ed.* 2d 935, 967–70 (1974). Since I have nothing to add to his analysis and I cannot express it as well as he, I adopt his words as my own and incorporate them herein by reference.

CONFORD, P. J. A. D., Temporarily Assigned (concurring). I join the comprehensive and epochal opinion of the Chief Justice for the Court, subject only to the following comments, and concur in all of its determinations of the issues raised by the parties and *amici*.

With respect to "Legislative Delegation of Authority", I regard the issue as fully laid to rest, prospectively, by *L.* 1975, *c.* 95. This statute is quoted in the Court's opinion, and it expressly confers power on each correctional and penal institution, subject to guidelines set down by the Director, to adopt regulations governing the rights, privileges, duties and obligations of inmates, including matters of sanctions for violation of rules and procedure for imposition thereof. Taken together with the universally conceded inherent power of the keeper of a correctional or penal

institution to enforce reasonable rules and regulations with regard to the inmate population thereof, 72 *C. J. S.* Prisons § 18, p. 872, there can remain no longer any colorable question as to adequacy of legislative standards for the guidance of the Department in respect of these matters. As to the adequacy of the standards prior to the adoption of the 1975 act, I agree with the opinion of the Court.

As to "Public Involvement", I agree with the Court that the argument that First Amendment values require the advance notification to the public of proposals for adoption or amendment of prison rules and regulations is without merit. Further, as the Court points out, such proposed rules are now published in the New Jersey Register in advance of promulgation (notwithstanding exemption from the Administrative Procedure Act), and the public thus has an opportunity for input on such rules before adoption. I would rest with these observations. I cannot, with all deference, join in the implication of the opinion that there may be harm to the correctional system in public debate over proposed rules. Such debate would not, in my view, at all compromise authority in the governance of the institutions. Over the long run, it is bound to be salutary, as the court itself implies elsewhere in the opinion. Legislative awareness of these considerations seems implicit in Section 13 of the Department of the Public Advocate Act (*L.* 1974, *c* 27), which establishes an Office of Inmate Advocacy, and authorizes it, among other things, to "act as representatives of inmates with any principal department or other instrumentality of State, county or local government."

Conford, P. J. A. D., concurring in the result.

*For affirmance as modified*—Chief Justice Hughes, Justices Mountain and Sullivan and Judge Conford—4.

*Concurring in part and dissenting in part*—Justice Pashman—1.