928 A.2d 878 (2007)
395 N.J. Super. 266
Taysir SHEIKA, Petitioner-Appellant,
v.
NEW JERSEY DEPARTMENT OF CORRECTIONS, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted March 13, 2007.
Decided July 30, 2007.
*879 Taysir Sheika, appellant, filed a pro se brief.
Stuart Rabner, Attorney General, attorney for respondent (Michael J. Haas, Assistant Attorney General, of counsel, Christopher C. Josephson, Deputy Attorney General, on the brief).
Before Judges KESTIN, PAYNE and GRAVES.
The opinion of the court was delivered by
PAYNE, J.A.D.
Petitioner, Taysir Sheika, a Muslim Palestinian national, but a naturalized U.S. citizen,[1] appeals from his nonconsensual out-of-State transfer to Connecticut to serve the remaining nineteen years of a thirty-year sentence for murder. On appeal, he raises the following issues.
POINT I
THE DECISION OF THE HEARING OFFICER VIOLATES APPELLANT'S RIGHT TO DUE PROCESS AND IN THE INTEREST OF JUSTICE SHOULD BE VACATED.
The Decision of the H.O. Should Be Vacated Because It Was Not Based Upon "Substantial Credible Evidence."
POINT II
APPELLANT WAS TRANSFERRED IN VIOLATION OF HIS FIRST AMENDMENT RIGHT.
We reverse.

I.
The following facts are of relevance to this matter. On January 5, 2006, the Commissioner of the Department of Corrections notified the Special Investigations Division (SID) that "several inmates housed at New Jersey State Prison (NJSP) had been developing an escape plan. The information indicated that inmate Saleh, Abdel # 264942 was soliciting other inmates to participate in this plan. Inmate Sheika, Taysir # 263137 was identified as the cell mate of Saleh." On the day the information was received by the SID, Sheika was locked out of his cell and placed in 6-Left general population emergency *880 housing. On January 6, his property was packed up and taken by the SID. The property was searched, and determined to contain, among other things, twenty-four word processor disks. Although the disks contained no information relating to an escape plan, "a voluminous amount of religious (Islamic) rhetoric" was found, "both including transcribed articles from religious publications and numerous computer files of [Sheika's] `interpretations' of the Koran."
As the result of the SID's investigation, it was determined that Saleh "had solicited inmate[s] at NJSP to assist in planning elements of an escape." On January 17, 2006, Sheika was questioned by SID Investigator Raphael Dolce, along with an unnamed investigator from the FBI, regarding his knowledge of the alleged escape plot by his cellmate, Saleh. Dolce found Sheika's responses to questions regarding Sheika's knowledge of Saleh's escape plans and Sheika's own participation in it to be "evasive" and noted that Sheika declined to take a polygraph examination.[2] Although Dolce concluded that there was "no direct information" that linked him to Saleh's escape plan, Dolce observed that the two men had been housed together for eleven years, and both were Palestinian nationals, with an avowed hatred of Israel, who practiced the Muslim religion. Additionally, Sheika had acknowledged that if Saleh had been "involved" in anything, Sheika would have known about it. The investigator also noted that during the investigation of Saleh, it was determined that Saleh (not Sheika) was able to exert influence over other inmates based upon their faith in Islam  the faith practiced by Sheika  and that Sheika had "maintained an extensive array of Islamic writings." On this basis, Dolce concluded:
Given the facts of this case, it is not unreasonable to believe that Sheika did know of Saleh's ideations and was a potential participant.
Dolce's recommendations were as follows:
It is recommended that Inmate Sheika be transferred to a different state to serve the remainder of his sentence. It is further recommended that he be sent to a state with a low Muslim population as he has affiliated with another inmate who has used his knowledge of Islam to influence other inmates and it is believed that Sheika could do the same. This transfer would aid in the overall security of the NJ DOC as all facilities in New Jersey have a significant Muslim population.
On February 3, 2006, Sheika's property was returned to him. However, on February 24, 2006, Sheika was placed, without charges, in emergency housing in 1-Left detention, and was subjected to the restrictions applicable to inmates in disciplinary detention. He requested information regarding the cause of his confinement and protested the move in formal complaints and requests for release to the general population dated February 24, February 27, February 28, and March 2, 2006. In a response from Associate Administrator Michelle Ricci, dated February 28, 2006, Sheika was informed:

*881 Please be advised that this is in response to your numerous letters concerning your status as an Emergency Housing inmate. For security reasons, which I do not have to discuss with you, it was determined that you were to be moved from 6 Left to 1 Left. Upon my receipt of the Special Investigations Division report regarding this matter, you will be advised of any actions that may be taken regarding your housing assignment.
On March 8, 2006, Sheika was placed in 1-Right on non-congregate status. He remained in that location for the remainder of his imprisonment in New Jersey.
Finally, on March 9, 2006, Sheika received a notice of intent to seek nonconsensual interstate transfer and of a hearing in the matter, scheduled for March 11, 2006. The notice stated that the reason for the transfer was: "Presence of crisis situation in which reduction of inmate population is essential." In further explanation, the notice, which we reproduce verbatim, stated:
Based on relevant information and the Special Investigation Divisions (SID) report on file. Search of I/M Sheika's property contained both transcribed articles from religious publications and numerous files of his "interpretations" of the Koran. Given I/M Sheika's evasive actions, extensive array of Islamic writings and word processor disks. It is recommended that he be sent to a state with a low Muslim population to reduce the potential to use his knowledge of Islam in order to influence other Muslim inmates.
Sheika was offered, and requested, counsel-substitute for the hearing, and inmate/paralegal James Williams was assigned. According to Williams's certification, on March 14, 2006[3] at 9:50 a.m., he was called to represent Sheika at the hearing on nonconsensual transfer. "At the very outset of the hearing," Williams claimed, he "requested a postponement because, not only was this the first time I had seen prisoner Sheika, but more importantly, I needed the time to prepare a defense and collect evidence." The request was denied. Williams certified further:
7. I next asked if there were any confidential information that was going to be relied on during the hearing and the hearing officer said "No." Thus, after reading the reports submitted as evidence during the hearing I requested the entire process be dismissed for lack of substantial evidence[.] [H]owever, the hearing officer denied my request again.
8. I then stated that the contents of prisoner Sheika's Notice didn't reveal any type of wrong doing and any reliance on it to support the administration's intent to transfer him amounted to religious persecution. The hearing officer simply said to me "he will send me a copy of his decision as well as prisoner Sheika and the hearing was now over."
Sheika did not give testimony at the hearing, although his presence was noted and an inmate statement was admitted in evidence, in which Sheika admitted his Muslim faith, but denied any leadership role as well as any violation of prison rules. Sheika claimed his transfer constituted religious discrimination, and he emphasized the burdens that would be imposed upon him as the result of transfer. No other witnesses were present at the hearing, and no other testimony was provided.
In a notice of decision dated March 8, 2006, but referring to the March 14 hearing, *882 the hearing officer granted the relief sought by the Department of Corrections. In his "summary of reasons or evidence relied on," he stated:
A-1  SID Report submitted by Investigator Dolce. During the course of an investigation it has been determined that inmate Sheika may have had knowledge of an escape plan initiated by inmate Saleh # 264942 (his cell mate for 11 years). Additionally, it has been determined that inmate Sheika maintained influence upon other Muslim inmates and a strong likelihood exists that inmate Sheika, along with inmate Saleh, had planned to disrupt the security of the institution.
In a further statement setting forth his "Reason for Decision," the hearing examiner wrote:
Hearing Officer relies on SID report (A-1) by Investigator Dolce stating based on an investigation it was determined that inmates Sheika and Saleh # 264942 were participants in a plan not only to attempt an escape but maintained significant influence upon other Muslim inmates, a likelihood that the two inmates were planning/attempting to disrupt the security and safety of the facility. The inmate's evasive responses during the investigation led Investigator Dolce to determine inmate Sheika had knowledge of the plans. Therefore, in an effort to maintain the security of the facility as well as other facilities within the State of New Jersey, inmate is released for inter-state transfer.
Sheika was transferred on April 24, 2006, and is now confined as inmate # 339868 at MacDougall Walker Correctional Institution, 1153 East Street, South, Suffield, Connecticut. The records of his incarceration in New Jersey indicate that he was imprisoned in 1994, and aside from discipline for assault and for conduct which disrupts in August 1996, his disciplinary record is clean.

II.
The authority of New Jersey to effect a nonconsensual interstate transfer is provided by the Interstate Corrections Compact, codified in New Jersey at N.J.S.A. 30:7C-1 to -12. Applicable regulations appear in N.J.A.C. 10A:10-3.1 to -3.19. We find the Department of Correction's compliance with those regulations to have been markedly deficient.
N.J.A.C. 10A:10-3.9(a) requires service of a Notice of Intent to Seek Nonconsensual Interstate Transfer, informing the inmate of the referral and of a scheduled hearing in the matter. N.J.A.C. 10A:10-3.9(b) mandates that the notice be served personally on an inmate more than 48 hours prior to the hearing, and that it "contain a summary of information which will be considered by the Hearing Officer." The notice in this case, which we have previously quoted in its entirety, did not conform, stating only that a search of Sheika's property had disclosed extensive Muslim materials, that Sheika had engaged in "evasive actions" of an unspecified nature, and it was recommended that he be sent to a state with a low Muslim population to reduce the potential that Sheika would use his knowledge of Islam to influence other Muslim inmates in manners that were undescribed.[4] No mention was made of the SID investigation, its subject, the identity of the investigator, or the investigation's findings and conclusions regarding Sheika's knowledge of Saleh's escape plans and potential participation in them. It does not appear that the SID *883 report was provided to Sheika prior to the hearing, although it was later marked as an exhibit at the hearing and was not deemed confidential material there. Additionally, there is no evidence of compliance with N.J.S.A. 10A:10-3.9(d), which requires that Sheika be given a copy of the regulations applicable to interstate transfer and a copy of a "Form 822-III," the content of which is unknown to us.[5]
N.J.A.C. 10A:10-3.10(a) provides that at least twenty-four hours prior to the hearing, an investigator shall visit the inmate to obtain the names of prospective witnesses. There is no evidence that such occurred, and no witnesses were called.
N.J.A.C. 10A:10-3.10(d) permits the appointment of counsel-substitute, which occurred here. However, the certification of counsel-substitute states, without contradiction, that he was informed of the appointment immediately before the hearing, that he did not have time to consult with Sheika, that he lacked the ability to prepare, and that his request for an adjournment was denied. Again, the record does not demonstrate that either Sheika or counsel-substitute was ever informed of the full nature of the charges prior to the hearing.
Although the State claims that the regulations do not require that Sheika be provided with access to a paralegal prior to the date of the hearing, and that a lack of any opportunity to prepare does not constitute "exceptional circumstances" warranting a postponement pursuant to N.J.A.C. 10A:10-3.11(e), we disagree. Although the regulation illustrates "exceptional circumstances" as constituted by "sudden serious illness, security problems or a lockdown," we are unwilling, in a case in which no immediate security threat was perceived, to confine such circumstances to the narrow range of examples provided. Given the lack of adequate notice and the inability of counsel-substitute to confer with Sheika or prepare a defense, a short adjournment was warranted. We have held in a prison discipline context that inmates, like other litigants, are entitled to "a fair opportunity to prepare a defense," and that every inmate has an enforceable "interest [] in a fair hearing." Wakefield v. Pinchak, 289 N.J.Super. 566, 571, 574, 674 A.2d 621 (App.Div.1996). The procedures in this case were inadequate to ensure that a fair hearing occurred.
The examiner's decision indicates that no confidential information was utilized, and that he relied on the SID report in reaching his decision. As we have noted, it does not appear that the SID report was furnished to Sheika prior to the hearing. In any case, investigator Dolce was never called as a witness, and his description of his interrogation of Sheika and the conclusions drawn from it were never subject to cross-examination. However, at the hearing, Sheika's credibility in denying his leadership role among Muslims and his knowledge of Saleh's plans clearly was at issue.
The record does not permit us to determine whether Sheika was offered the opportunity to call witnesses, or if he would have done so, had he been informed of the content of the SID report, the identity of its author, and its significance in the determination to transfer. We nonetheless recognize the significance of in-person confrontation and cross-examination, and of the deprivation that Sheika sustained if, knowing both the facts and his rights, he would have called Dolce as a witness. See *884 Jones v. Dept. of Corrections, 359 N.J.Super. 70, 819 A.2d 1 (App.Div.2003). There, we observed:
As a general matter in our system of adjudication, in-person confrontation and cross-examination have traditionally been regarded as the best ways to test credibility. We have previously applied that principle to inmate disciplinary proceedings, and we now reaffirm that view. Nothing substitutes for the trier of fact's opportunity, in measuring truth or falsity, to view the witness's demeanor in presenting his allegations.
[Id. at 76-77, 819 A.2d 1 (citations omitted).]
We observe that the evidence against Sheika with respect to his knowledge of or participation in Saleh's escape plan apparently was not deemed sufficient to lead to disciplinary charges pursuant to N.J.A.C. 10A:4-4.1, *101, escape, Dolce having found "no direct information . . . to prove that Sheika had been involved in planning elements of an escape," and we have been informed of no precautions against escape undertaken by the Department of Corrections while Sheika remained in New Jersey, prior to his ultimate transfer to Connecticut on April 24, more than a month after the hearing date. As a consequence, it is reasonable to conclude that Sheika's transfer was based upon the hearing examiner's determination that "Sheika . . . maintained significant influence upon other Muslim inmates," and as a consequence, his removal was necessary for the security of New Jersey's prisons. However, although the record contains ample evidence of Sheika's religious interests and activities, SID Investigator Dolce identified only Saleh as being "able to exert influence over other inmates based upon their faith in Islam." We thus question the foundation for the hearing examiner's similar conclusions regarding Sheika and regard Sheika's concern that his transfer resulted from religious bias to have a colorable foundation.
It has long been established that the procedural due process protections available to inmates such as Sheika are reduced as the result of their status. Avant v. Clifford, 67 N.J. 496, 522, 341 A.2d 629 (1975). Nonetheless, Sheika was entitled to adequate notice of the charges against him, id. at 525, 341 A.2d 629; to a limited right to call witnesses, id. at 529, 341 A.2d 629; to a limited right to cross-examine adverse witnesses, id. at 529-30, 341 A.2d 629; and to the effective assistance of counsel-substitute. Id. at 529, 341 A.2d 629. See also McDonald v. Pinchak, 139 N.J. 188, 652 A.2d 700 (1995) and Jacobs v. Stephens, 139 N.J. 212, 652 A.2d 712 (1995). Our recitation of the facts of this matter disclose that Sheika was denied these essential procedural rights, and as a consequence, a new hearing must occur.
While the Department of Corrections possesses the right to transfer Sheika's custody to Connecticut, we find it essential that, in doing so, this State conform to the procedural protections guaranteed by Avant and its progeny and codified in the Administrative Code. We are mindful of Sheika's allegation that he was transferred, not for anything that he did or reasonably could be found likely to do in the future that would impair the security of New Jersey's prisons, but rather because he is a practicing Palestinian Muslim in a time when persons of his nationality and religion are treated with distrust. Without a full and fair hearing, the foundation for that allegation cannot be reasonably evaluated.
The matter is remanded for further proceedings in accordance with this opinion. A hearing shall be conducted, in New Jersey, within ninety days of this order. See *885 N.J.S.A. 30:7C-5f. Jurisdiction is retained.
NOTES
[1] Sheika's prison records suggest that the State contests Sheika's legal status. However, no argument or evidence has been provided on this issue.
[2] We find a refusal to undergo a polygraph to be of no evidential value. See State v. Driver, 38 N.J. 255, 260-61, 183 A.2d 655 (1962) (holding in a criminal prosecution that reference to defendant's refusal to take a polygraph constituted reversible error and observing that if the results of a polygraph are uniformly held inadmissible, in the absence of consent, a fortiori, "refusal by a defendant in a criminal case to submit to one cannot be made the subject of testimony"). See also N.J.A.C. 10A:3-7.5(b)("No inmate shall receive a disciplinary charge for refusal to take a polygraph examination.").
[3] The date of the hearing was changed to accommodate Muslim religious practices.
[4] It is noteworthy that Saleh, not Sheika, was the one who was found by investigators to be influencing other Muslims. Sheika was found only to possess extensive Muslim materials.
[5] The pre-printed Notice of Decision form indicates that N.J.A.C. 10A:10-3 was served on Sheika. However, the language is printed boilerplate, and no acknowledgement of service has been provided.